No. 17-2246

_____

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

ANTHONY CECE; JEFFREY CHESNEY; NEIL DONAHUE;
KEVIN GILLIAM; GREGORY GORDISH; JOHN HARDIE; LESLIE
HOLCOMB; WILLIAM HOMROCKY; MICHAEL KASHOLO;
RAYMOND KERIMIAN; MICHAEL LONG; MICHAEL MEEKINS;
TAMERIA METIVA; WILLIAM MITTLESTAT; TIMOTHY MYERS;
TIMOTHY OLSZEWSKI; GARRY M. PALUCKI; TERRY POLLOCK;
CAMERON PORZONDEK; JAMES RENDALL; LUCKY RILEY;
RONALD ROBERTS; DANIEL ROULO; RONALD ROSSELLE; NINA
TRUMP; JEFFREY VAKRATSIS; REGINALD VANWULLEN;
CYTRESSE WATSON; JOSEPH WARNICK; DARLETTA BUFORD;
FRANK PENZIN; LISA CARTER; BARBARA BOLDEN; JEFFREY
FALCONER; RODNEY BRADBURN; WILLIAM THOMPSON;
JOHN KOPY; TYRONE JACKSON; REGINAIEL PRUITT, GREGORY
JOHNSON; ARLENE COLLINS; KATHLEEN DUDLEY; ANTHONY
WATSON; LINDA ROGERS; JAMES PANACKIA; EARL MOORE;
JEFFERY GAGACKI; MARY RAUBOLT; CHERYL WALKER-HEIGHT;
RAYMOND BATES; JAMES DELOOFA; JANICE MCCLELLAN;
DONALD MIXON; MICHAEL MODES; DOUGLAS L. SEIPELT,

*Plaintiffs/Appellants,*

v

WAYNE COUNTY; ROBERT FICANO; WARREN EVANS,

*Defendants/Appellees.*

_____

*On Appeal from the United States District Court for the*
*Eastern District of Michigan*
*Case No. 2:16-cv-10410 (Hon. Arthur J. Tarnow)*

_____

## DEFENDANTS/APPELLEES' CORRECTED BRIEF ON APPEAL

_____

{01680277}

ZAUSMER, AUGUST & CALDWELL, P.C.
GARY K. AUGUST, MI Bar No. P48730
MATTHEW G. MCNAUGHTON, MI Bar No. P66097
32255 Northwestern Hwy., Suite 225
Farmington Hills, MI 48334
(248) 851-4111
gaugust@zacfirm.com
mmcnaughton@zacfirm.com
*Counsel for Defendants/Appellees Wayne County,*
*Robert Ficano, and Warren Evans*

## **Corporate Disclosure Statement**

Pursuant to Sixth Circuit Rule 26.1, by and through their counsel, Defendants/Appellees Wayne County, Robert Ficano, and Warren Evans state that Wayne County is not a subsidiary or affiliate of any publicly owned corporation and that Ficano and Evans are individuals. Wayne County, Ficano, and Evans are unaware of any publicly owned corporation that has a financial interest in the outcome of this litigation.

*/s/ Gary K. August*
Gary K. August, MI Bar No. P48730
Matthew G. McNaughton, MI Bar No. P66097
32255 Northwestern Hwy., Suite 225
Farmington Hills, MI 48334
(248) 851-4111
gaugust@zacfirm.com
mmcnaughton@zacfirm.com
*Counsel for Defendants/Appellees Wayne*
*County, Robert Ficano, and Warren Evans*

Dated: May 1, 2018

# **Table of Contents**

Table of Authorities ...........................................................................v

Statement of the Case.........................................................................1

I.    Introduction...........................................................................1

II.   Background Information..........................................................2

    A.    History of the relevant collective bargaining agreements....................2

    B.    The unions and the County enter into MOAs with retirement incentives.................................................................5

        1.  The Local 3317 MOAs.........................................6

        2.  The MOA between Wayne County and POAM. ............9

    C.    Amounts charged to Plaintiffs for health insurance premiums...........11

    D.    The current litigation. ........................................................13

Summary of Arguments ....................................................................14

Arguments ......................................................................................18

I.    Standard of Review...............................................................18

II.   Plaintiffs' breach of contract claim fails because the MOAs did not promise premium-free health insurance, let alone premium-free health insurance for life. ........................................................18

    A.    The MOAs unambiguously tied Plaintiffs' health insurance premium liability to that of the pre-Act 312 Award retirees rather than stating that their health insurance would be premium-free.........19

    B.    Because the 1990 HWBP permitted the County to require prior union retirees to contribute the cost of their health insurance premiums, Plaintiffs were also contractually required to contribute............................................................21

    C.    The MOAs do not promise any lifetime benefits, even if they promised that Plaintiffs would receive premium-free health insurance.........................................................................23

        1.  Applying *Reese*, *Tackett*, and *Gallo* to this case, it is evident that the MOAs do not provide Plaintiffs with premium-free health insurance for life.........................27

       2.   Plaintiffs' "evidence" that the parties intended the MOAs to provide a lifetime benefit with respect to their health insurance premiums is unavailing....................................30

III.   Plaintiffs' due process claim is baseless as a matter of law. .........................33

IV.   The claims against Evans and Ficano should be dismissed regardless of whether Plaintiffs' claims are legitimate as to Wayne County. ....................36

V.    Plaintiffs' arguments in their Brief of Appeal fail to provide any basis for reversing the District Court's dismissal of their claims..........................39

    A.    The District Court properly rejected Plaintiffs' Motion for Reconsideration asserting that they alleged a claim for promissory estoppel..............................................................40

    B.    Plaintiffs' arguments regarding the claims actually made in their complaints fail to provide any legal basis for reversing the District Court's decision to grant Summary Judgment in Defendants' favor. .................................................................44

        1.   Plaintiffs' "pension" benefits are irrelevant to their claims...........44

        2.   The District Court necessarily determined that Plaintiffs' § 1983 claim failed when it decided that Plaintiffs had no contractual right to lifetime, premium-free health insurance. .......44

        3.   Plaintiffs' argument that the MacDonald settlement agreement applies to them is untimely and otherwise does not support their position that they are entitled to premium-free health insurance for life...............................................45

        4.   Contrary to Plaintiffs' assertions, by charging Plaintiffs for a portion of their health insurance premiums, the County did not change the terms of the MOAs. ................................49

        5.   Plaintiffs allege that the "1999 Health & Welfare Benefit Plan" applied on the dates that the MOAs were signed, but no such document exists......................................50

        6.   Contrary to Plaintiffs' allegations, Defendants raised affirmative defenses supporting the arguments made in the District Court that this matter should be decided on Summary Judgment. ......................................................50

        7.   The District Court did not wrongly find in Defendants' favor based on policy considerations. ...................................51

Conclusion ...................................................................................................52

Certification of Compliance ......................................................................54

Designation of Relevant District Court Documents ................................55

Proof of Service .........................................................................................58

## Table of Authorities

**Cases**

*APJ Assocs. v. N. Am. Philips Corp.*,
   317 F.3d 610 (6th Cir. 2003) ..............................................................................42

*Armstrong v. City of Melvindale*,
   432 F.3d 695 (6th Cir. 2006) ...................................................................... 45, 46

*Bell v. Westmoreland Cent. Sch. Dist.*,
   1991 U.S. Dist. LEXIS 3063 (N.D.N.Y. 1991) .......................................... 38, 39

*Briggs v. Univ. of Detroit-Mercy*,
   22 F. Supp. 3d 798 (E.D. Mich. 2014) ................................................................42

*Charles v. Baesler*,
   910 F.2d 1339 (6th Cir. 1990) ............................................................................36

*City of Pontiac Retired Empls. Ass'n v. Schimmel*,
   726 F.3d 767 (6th Cir. 2013) ...................................................................... 38, 39

*Clark v. National Travelers Life Ins. Co.*,
   518 F.2d 1167 (6th Cir. 1975) ............................................................................41

*CNH Indus. N.V. v. Reese*,
   138 S. Ct. 761 (2018) ...................................... 19, 24, 25, 27, 28, 32, 33

*Domingo v. Kowalski*,
   810 F.3d 403 (6th Cir. 2016) ..............................................................................18

*Dunn v. Bennett*,
   303 Mich. App. 767; 864 N.W.2d (2014) ..........................................................36

*Experimental Holdings, Inc. v. Farris*,
   503 F.2d 514 (6th Cir. 2007) ..............................................................................35

*Gallo v. Moen Inc.*,
   813 F.3d 265 (6th Cir. 2016) .................................. 19, 24, 25, 26, 27, 28, 31, 32

*Gore v. Flagstar Bank, FSB*,
  474 Mich. 1075; 711 N.W.2d 330 (2006) ............................................42

*Goss v. CitiMortgage, Inc.*,
  2017 U.S. Dist. LEXIS 18604, at 12 (E.D. Mich. 2017) ............................. 42, 60

*Harper Woods Retirees' Ass'n v. City of Harper Woods*,
  312 Mich App 500 (2015) ....................................................................19

*Int'l Union v. Yard-Man*,
  716 F.2d 1476 (6th Cir. 1983) ........................................... 25, 28, 32, 33

*Kaminski v. Coulter*,
  865 F.3d 339 (6th Cir. 2017) ................................................. 16, 34, 35

*Kentucky v. Graham*,
  105 S. Ct. 3099 (1985).........................................................................36

*Kusens v. Pascal Co.*,
  448 F.3d 349 (2006) ............................................................... 45, 46

*M&G Polymers USA, LLC v. Tackett*,
  135 S. Ct. 926 (2015)........................................... 19, 24, 25, 27, 32, 33

*Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*,
  469 Mich. 362; 666 N.W.2d 251 (2003) ............................................50

*Serafino v. City of Hamtramck*,
  707 Fed. Appx. 345 (6th Cir. 2017) ....................................................19

*Serafino v. Hamtramck*,
  2016 U.S. Dist. LEXIS 132055 (E.D. Mich. 2016) ..................................... 34, 56

*Sharp v. Lindsey*,
  285 F.3d 479 (6th Cir. 2002) ..............................................................35

*Taylor v. Barkes*,
  135 S. Ct. 2042 (2015).........................................................................37

{01680277}

*Villegas v. Metro. Gov't of Nashville*,
  707 F.3d 563 (6th Cir. 2013) ..................................................................18

*Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*,
  280 Mich. App. 16; 761 N.W.2d 151 (2008) .......................................43

## Statutes

42 U.S.C. § 1983 ................................................ 33, 34, 35, 36, 40, 44, 45

MCL 423.231 ...........................................................................................4

Michigan Public Act 312 of 1969 .............................................................3

## Rules

Fed. R. Civ. P. 56 ..................................................................................18

## **Statement Regarding Oral Argument**

Wayne County, Ficano, and Evans (collectively the "Defendants") believe that the issues to be decided by this Honorable Court are straightforward, are guided by existing precedent, and do not require oral argument. Therefore, the Defendants disagree with Plaintiffs' position that oral argument is necessary for this case. If the Court decides that oral argument would be helpful, however, Defendants respectfully request the opportunity to present oral argument.

## **Statement of Jurisdiction**

Defendants concur with Plaintiffs that this Court has jurisdiction to hear Plaintiffs' appeal.

## <u>Questions Presented</u>

1. The Supreme Court has held that agreements negotiated by labor unions on behalf of their membership are to be interpreted using ordinary principles of contract interpretation.  Here, the contracts at issue state that Plaintiffs "will be allowed to retire with the same health care plan contribution liability as individuals who retired on or before" a date specified in the contracts.  Under ordinary principles of contract interpretation, does this language tie Plaintiffs' health care contribution liability to the amounts the individuals identified in the contracts are required to pay?

2. The Supreme Court has held that "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life" and must instead apply ordinary principles of contract interpretation to determine whether the contract provides vested benefits. Where Plaintiffs claim a right to lifetime premium-free health insurance notwithstanding the absence of any language in the agreements promising lifetime benefits, do the agreements' terms support Plaintiffs' position?

3. The Sixth Circuit has held that no constitutionally protected property interest exists where there is an adequate state breach of contract action available as a remedy.  Here, even assuming that Plaintiffs are entitled to the benefit they claim—which they are not—should Plaintiffs' § 1983 claim be dismissed where their claimed harm is adequately remedied by their breach of contract action?

4. Where the individual Defendants, Warren Evans and Robert Ficano, are not parties to the contracts at issue, can they be found liable for breach of these contracts?

5. The Supreme Court has held that a claim against an official of a public entity in their official capacity is a claim against the public entity itself, and that a successful plaintiff cannot execute on the assets of the official to recover on a judgment but must instead look to the public entity.  Where Plaintiffs have brought the same claims against Wayne County as they have brought against Evans and Ficano in their official capacities, and the claims are therefore redundant, should the claims against Evans and Ficano be dismissed?

6. The Supreme Court has held that qualified immunity shields governmental officials from civil damages unless the official violated a clearly established constitutional right. Here, Plaintiffs claim that Evans and Ficano deprived them of a protected property interest (i.e., their alleged right to premium-free health care for life). Where, at minimum, it is unclear whether Plaintiffs' claimed interest is constitutionally protected, are Evans and Ficano protected by qualified immunity?

7. Under Michigan law, the implied contract theory of promissory estoppel cannot override the express written agreement of the parties on the same subject matter. Where Plaintiffs' written contracts address their agreement regarding their obligations to contribute to the cost of their health insurance premiums, can they permissibly bring a claim of promissory estoppel addressing this same issue?

## **Statement of the Case**

### I.    **Introduction**

Plaintiffs in this case are former Wayne County Sheriff's Officers, Sergeants, and Lieutenants who retired under one of several memoranda of agreement ("MOAs") and related collective bargaining agreements entered into between Wayne County and Plaintiffs' respective unions.

One of the issues covered by the MOAs was the cost Plaintiffs were required to bear with respect to their health insurance premiums in retirement. The MOAs provide that Plaintiffs' obligations to contribute to these premium costs would be the same as former union members who previously retired from Wayne County.

For years after Plaintiffs retired, the retirees to whom Plaintiffs' health insurance premium obligations were tied were not required to contribute to the cost of their insurance premiums and, in accordance with the terms of the MOAs, Plaintiffs too received their health insurance at no premium cost. However, due to budget constraints, in 2014 Wayne County began requiring the linked retirees identified in the MOAs to pay a portion of their premiums. As provided by the MOAs, Wayne County likewise required Plaintiffs, who were linked to these retirees, to begin contributing the same amount toward these costs.

In this lawsuit, Plaintiffs claim that the MOAs promised that they would never have to contribute to the cost of their health insurance premiums. The

{01680277}

Defendants dispute that Wayne County agreed to never require contributions from Plaintiffs and assert that the MOAs' language does not reflect any such promise.

## II.   **Background Information**

A.   History of the relevant collective bargaining agreements.

In 2001, the Sergeants' and Lieutenants' union, Local 3317, and the Sheriff's Officers' union, Local 502, entered into separate collective bargaining agreements ("CBAs") with Wayne County with terms intended to cover the 2000 to 2004 time period (collectively the "2000-2004 CBAs").  (Local 3317 2000-2004 CBA, R. 44-1, Page ID # 406-530; Local 502 2000-2004 CBA, R. 44-1, Page ID # 532-671).

As is relevant to this case, the 2000-2004 CBAs did not directly address the payment of health insurance premiums for individuals who retired under those CBAs.  Instead, the provisions relevant to retiree health care were contained in the Wayne County Health and Welfare Benefit Plan, effective December 1, 1990 (the "1990 HWBP"), which was incorporated into the 2000-2004 CBAs.  (Local 3317 2000-2004 CBA, R. 44-1, § 37.01, Page ID # 495; Local 502 2000-2004 CBA, R. 44-1, § 31.01, Page ID # 613).

Similar to the benefits provided to active employees under the CBAs, the 1990 HWBP stated that Wayne County would "continue to provide health benefits at its expense to eligible retirees and their legal dependents."  (1990 HWBP, R. 44-

2, § 6, Page ID # 683).  However, the 1990 HWBP also contained a reservation of rights clause providing that "[t]he County reserves the right to modify, amend, replace and/or discontinue any retiree health benefit provisions applicable to retirees."  (1990 HWBP, R. 44-2, § 8, Page ID # 685).

The 2000-2004 CBAs were to "remain in full force and effect through November 30, 2004."  (Local 3317 2000-2004 CBA, R. 44-1, § 44.01, Page ID # 530; Local 502 2000-2004 CBA, R. 44-1, § 45, Page ID # 667).  However, the CBAs also provided they would be effective after November 30, 2004 unless the County or the unions gave notice that they wished to modify, amend, or terminate the CBAs.  (Local 3317 2000-2004 CBA, R. 44-1, § 44.02, Page ID # 530; Local 502 2000-2004 CBA, R. 44-1, § 45, Page ID # 667).

Prior to November 30, 2004, both Local 3317 and Local 502 attempted to negotiate new CBAs with the County, but the parties were unable to agree to the terms of new CBAs before November 30, 2004.  As such, the 2000-2004 CBAs remained in effect beyond November 30, 2004 while the parties continued their negotiations.  (P. Melton Dep., R. 44-2, at 22:8-12, 25:2-11, Page ID # 690-691; M. Royal Dep., R. 44-2, at 15:16-23, Page ID # 701).

Ultimately, Local 3317, Local 502, and the County engaged in Act 312

Arbitrations[1] between 2004 and 2007 due to their inability to reach an agreement on new CBAs. On May 2, 2007, the Act 312 panel issued its Opinion and Award with respect to Local 3317. (Local 3317 Act 312 Award, R. 44-2, Page ID # 712-795). And on December 12, 2007, the panel issued its Opinion and Award with respect to Local 502. (Local 502 Act 312 Award, R. 44-3, Page ID # 797-972). These Awards supplied the terms for new CBAs between the County and the respective unions. The new CBAs had effective dates of December 1, 2004 and termination dates of September 30, 2008. (Local 3317 Act 312 Award, R. 44-2, Page ID # 794; Local 502 Act 312 Award, R. 44-3, Page ID # 970).

As is relevant here, the Act 312 Award CBAs required both active employees and the individuals who retired under those CBAs to contribute to the costs of their health insurance premiums in retirement. (Local 3317 Act 312 Award, R. 44-2, § 37.02(C), (D) Page ID # 767-768; Local 502 Act 312 Award, R. 44-3, § 31.02(C), (D), Page ID # 909-910). Significant to this case, however, the individuals who retired before the issuance of the Act 312 Awards remained governed by the 2000-2004 CBAs, even if they retired after November 30, 2004 and even though the Act 312 Award CBAs had effective dates of December 1, 2004. (P. Melton Dep., R.

---

[1] Michigan Public Act 312 of 1969, codified at MCL 423.231, et seq., compelled the arbitration of labor disputes between Wayne County and the police unions.

44-2, at 22:8-12, 25:2-5, Page ID # 690-691; M. Royal Dep., R. 44-2, at 15:16-21, 49:15-18, Page ID # 701, 705; W. Thompson Dep., R. 44-3, at 58:18-25, Page ID # 978). So the union members who retired prior to the issuance of the Act 312 Awards were not required to begin contributing to the cost of their health insurance premiums since their benefits in retirement were governed by the terms of the 1990 HWBP, which provided that the County would "provide health benefits at its expense" (subject to the County's reservation of its right to alter these benefits).

B.    The unions and the County enter into MOAs with retirement incentives.

Soon after the issuance of Act 312 Award CBAs in May and December 2007, the County began negotiating new CBAs with Local 3317 and the Sheriff's Officer's new union, the Police Officers Association of Michigan ("POAM"), since the Act 312 Award CBAs were set to expire on September 30, 2008.

Ultimately, in November 2008 for Local 3317 and in August 2009 for POAM, the parties reached agreements on new CBAs covering the 2008 to 2011 time period (collectively "2008-2011 CBAs"). (Local 3317 2008-2011 CBA, R. 44-4, Page ID # 980-1091; POAM 2008-2011 CBA, R. 44-4, Page ID # 1093-1211). Of note, the premium contribution requirements for retirees contained in the Act 312 Awards were carried over into the 2008-2011 CBAs. (Local 3317 2008-2011 CBA, R. 44-4, § 37.02(C), Page ID # 1057; POAM 2008-2011 CBA, R. 44-4,

§ 31.02(C), Page ID # 1167).

As part of the bargaining process for the 2008-2011 CBAs, the County also negotiated retirement incentives for certain eligible members of Local 3317 and POAM.    (K. Grabowski Dep., R. 44-5, at 25:11-24, Page ID # 1216).   These incentives are contained in a number of MOAs between the County and Local 3317 and POAM.

### 1. *The Local 3317 MOAs.*

The first MOA was negotiated and signed by Gerard Grysko—the President of Local 3317—and Mark Dukes—the Director of the County's Labor Relations Division—on October 30, 2008 (the "October 2008 MOA").  (October 2008 MOA, R. 44-5, Page ID # 1223-1224).   Because the October 2008 MOA was executed prior to the Local 3317 2008-2011 CBA, it was contingent on the execution of that CBA.  (October 2008 MOA, R. 44-5, preamble, Page ID # 1223).   The October 2008 MOA further provided that it would not affect any other terms of the to be executed Local 3317 2008-2011 CBA.  (October 2008 MOA, R. 44-5, ¶ 5, Page ID # 1223).   In other words, the parties agreed that the Local 3317 2008-2011 CBA would govern the rights and obligations of the County and the MOA retirees in their retirement other than as specifically modified by the October 2008 MOA.

The October 2008 MOA contained numerous incentives to encourage

individuals to retire. For example, for those employees in the "Defined Benefit and Hybrid Retirement Plans," it reduced the number of years necessary to retire so that relatively young members could retire with only 20 years of service, as opposed to 25 years under the 2008-2011 CBA. (*Compare* October 2008 MOA, R. 44-5, ¶ 1, Page ID # 1223 *with* Local 3317 2008-2011 CBA, R. 44-4, §§ 38.02(C), 38.03(A), 38.04(A), 38.06(B)(1), 38.07(A)(4) Page ID # 1070-1072, 1075, 1078). Additionally, members of the "Defined Contribution Plan" were eligible to retire with only 18 years of service, which was also earlier than permitted by the 2008-2011 CBA. (*Compare* October 2008 MOA, R. 44-5, ¶ 2, Page ID # 1223 *with* Local 3317 2008-2011 CBA, R. 44-4, § 38.05(A), Page ID # 1073). The October 2008 MOA also reduced the number of years used to calculate the average final compensation of the pension benefits from the average of four or five years (depending on the retirement plan the employee was in) to the average of the three highest years. (*Compare* October 2008 MOA, R. 44-5, ¶ 2, Page ID # 1223 *with* Local 3317 2008-2011 CBA, R. 44-4, §§ 38.02(F), 38.06(B)(3), 38.07(A)(2), Page ID # 1070, 1075, 1078). The October 2008 MOA thus incentivized retirement by: allowing qualified individuals to retire earlier than was permitted under the 2008-2011 CBA; allowing them to receive higher pensions than provided under the 2008-2011 CBA; and allowing them to receive those pension and health care benefits

immediately.

The October 2008 MOA also addressed health insurance premium costs by providing that the employees retiring under the MOA "will be allowed to retire with the same health care plan contribution liability as individuals who retired on or before the issuance of the May 2, 2007 Act 312 award." (October 2008 MOA, R. 44-5, ¶ 3, Page ID # 1223). Note that the October 2008 MOA did not address the *type* of health care insurance to which the retirees were entitled, just the retirees' obligations to contribute to the cost of their health care insurance. The actual health care benefits to which they were entitled were covered by the 2008-2011 CBA, which provided that retirees "shall participate in the same health care plan options, coverages, co-pays, deductibles, etc. as active employees covered by this, or any subsequent collective bargaining agreement." (Local 3317 2008-2011 CBA, R. 44-4, §§ 37.02(D), Page ID # 1057).

In June and August 2009, Local 3317 entered into additional MOAs to extend the time-period to take advantage of the October 2008 retirement incentive. (June 2009 MOA, R. 44-5, Page ID # 1226-1227; August 2009 MOA, R. 44-5, Page ID # 1229-1230). These MOAs stated in relevant part that eligible "[e]mployees…will be allowed to take advantage of the retirement incentive provisions associated with the 2008-2011 CBA." (June 2009 MOA, R. 44-5, ¶ 1(d), Page ID # 1226; August

2009 MOA, R. 44-5, ¶ 1(d), Page ID # 1229).  It is undisputed that the "retirement incentive provisions associated with the 2008-2011 CBA" refers to the October 2008 MOA.  (P. Melton Dep., R. 44-2, at 50:11-51:12, 78:8-79:12, Page ID # 695-698).  The June and August 2009 MOAs added no language regarding health insurance.

The deadline for eligible Local 3317 members to retire set forth in the August 2009 MOA was later extended by a September 2009 MOA.  (September 2009 MOA, R. 44-5, Page ID # 1232).  The September 2009 MOA also clarified that the reference to "the retirement incentive provisions associated with the 2008-2011 CBA" in the August 2009 MOA meant the retirement incentive provisions in the October 2008 MOA.  (September 2009 MOA, R. 44-5, ¶ 2, Page ID # 1232).

2.   *The MOA between Wayne County and POAM.*

During the preliminary negotiations of the Sheriff's Officers' 2008-2011 CBA, Local 502—the union then representing the Sheriff's Officers—also began negotiating a retirement incentive with the County.  (M. Royal Dep., R. 44-2, at 26:14-21[2], 27:2-4, Page ID # 702).  The proposed Local 502 retirement incentive

---

[2] Page 26 of Royal's deposition transcript was referenced in the Defendants' brief filed with the District Court, but it was inadvertently not included with the record below.  This transcript page is attached as **Exhibit 1** to Defendants/Appellees' contemporaneously filed Motion to Take Judicial Notice.

was very similar to the October 2008 MOA with Local 3317, but it—along with the entire CBA negotiated by Local 502—was rejected by Local 502's membership. (Proposed Local 502 Agreement, R. 44-5, p. 3, Page ID # 1236; M. Royal Dep., R. 44-2, at 27:9-17, Page ID # 702).

Soon after this rejection, POAM was certified as the new bargaining unit for the Sheriff's Officers. (M. Royal Dep., R. 44-2, at 27:9-28:13, Page ID # 702-703; K. Grabowski, R. 44-5, at 10:8-11:6, Page ID # 1214-1215). POAM thereafter took the lead on subsequent negotiations of the 2008-2011 CBA and the retirement incentive agreement. (K. Grabowski, R. 44-5, at 10:8-11:6, 26:25-27:11, Page ID # 1214-1215, 1217). Ultimately, POAM and the County reached an agreement on the 2008-2011 CBA and executed a MOA in July 2009 providing a retirement incentive to POAM's members (the "POAM MOA"). (POAM MOA, R. 44-5, Page ID #1242-1244).[3]

Like the Local 3317 MOAs, the POAM MOA contained numerous incentives. For example, as with the Local 3317 MOAs, the POAM MOA applied the three highest years of compensation when calculating the average final

---

[3] As with Local 3317's October 2008 MOA, POAM's MOA was contingent on the execution of POAM's 2008-2011 CBA, and POAM's MOA provided that it did not otherwise modify the terms and conditions of the to be executed 2008-2011 POAM CBA. (POAM MOA, R. 44-5, preamble and ¶ 8, Page ID # 1242, 1244).

compensation, and it permitted individuals to retire with benefits earlier than would have otherwise been permitted under the 2008-2011 POAM CBA.  (POAM MOA, R. 44-5, ¶¶ 1, 2, Page ID # 1242).

The POAM MOA also addressed the MOA retirees' health insurance in retirement by providing that they "will be allowed to retire with the same health care plan premium contribution liability as individuals who retired prior to January 1, 2008," and that "plan coverage, eligibility and benefits will be in accordance with the language of the 2008-2011 CBA."  (POAM MOA, R. 44-5, ¶ 3, Page ID # 1242).  So the POAM MOA, like the Local 3317 MOAs, only addressed the retirees' obligation to contribute to the cost of their health insurance premiums.  The type of health care coverage they were entitled to was governed by the 2008-2011 POAM CBA, which, as with 2008-2011 Local 3317 CBA, provided benefits that "mirrored" those of active employees.  (POAM 2008-2011 CBA, R. 44-4, § 31.02.D, Page ID # 1167).

C.    <u>Amounts charged to Plaintiffs for health insurance premiums</u>.

At the time the MOAs were executed, Local 3317 and Local 502 union members who retired before the respective Act 312 Awards were issued were not required by the County to contribute toward the cost of their health insurance premiums per the terms of the 1990 HWBP which provided that the County would

continue to provide health care benefits to retirees at its expense (subject to the County's reservation of rights to modify these benefits). (L. Calderoni Dep., R. 44-5, at 80:13-81:1; 98:22-99:10, Page ID # 1249-1252). As such, Local 3317 and POAM members who retired under the MOAs were also not required to contribute to these costs. In fact, neither of these groups of retirees were required to contribute to the cost of their health insurance premiums for years after the execution of the MOAs.

However, facing significant financial difficulties, in January 2014 the County began assessing premium contributions of approximately $90 per month to the pre-Act 312 Award retirees based on the 1990 HWBP's reservation of rights clause. (Dec. of L. Calderoni, R. 44-5, Page ID # 1257-1258; L. Calderoni Dep., R. 44-5, at 99:16-100:14, 109:20-110:16, Page ID # 1252, 1254-1255; M. Royal Dep., R. 44-2, at 50:25-51:12, Page ID # 706-707). At the same time, the County also began requiring the MOA retirees to contribute the same amount to the cost of their health insurance premiums since the MOAs required that they would have the same "health care plan contribution liability" as the union members who retired before the Act 312 Awards. Although a few MOA retirees called the County to ask about the health insurance premium deductions from their pension checks, Plaintiffs took no further action at that time. (*See, e.g.*, W. Thompson Dep. R. 44-3, at 46:22-48:3,

Page ID # 975-977; K. Gilliam Dep., R. 44-5,  at 82:1-19, Page ID # 1274).

D.    <u>The current litigation</u>.

On February 4, 2016—more than two years after the County first began assessing health care premiums to MOA retirees—Plaintiffs filed the instant action alleging: (1) breach of contract; and (2) unconstitutional deprivation of property interest without due process based on their allegation that the MOAs promised them premium-free health insurance for life.  (Plaintiffs' Complaint, R. 1, Page ID # 1-11).  Plaintiffs thereafter filed numerous amended complaints to add additional plaintiffs, but these amendments did not change the substance of Plaintiffs' claims. (*See, e.g.*, Plaintiffs' Fourth Amended Complaint, R. 41, Page ID # 305-316).

The Defendants filed a Motion for Summary Judgment (R. 44, Page ID # 369-404) based on a number of legal arguments, including that Plaintiffs were not promised premium-free health insurance for life by the MOAs (and other arguments that will be discussed herein).  The District Court entered an order granting Defendants' Motion on June 28, 2017 (R. 59, Page ID # 1640-1641) for the reasons stated on the record at the hearing on June 26, 2017.   These included that MOAs did not provide for permanent lifetime zero contributions for health insurance premiums and that the MOAs tied Plaintiffs' health insurance premium contributions to those of prior retirees.  (Hearing transcript, June 26, 2017, pp. 16-

17).

## **Summary of Arguments**

The primary issue in this appeal is whether the District Court correctly determined that Plaintiffs' MOAs with Wayne County did not promise them premium-free health care for life.

Defendants' first argument that the MOAs made no such promise is succinctly summarized as follows:

(1)  The MOAs provide that Plaintiffs "will be allowed to retire with the same health care plan contribution liability as individuals who retired" before the issuance of Act 312 Awards relevant to each Plaintiff's union;

(2)  The pre-Act 312 Award retirees retired under CBAs that did not directly address the cost of retiree health care;

(3)  Instead, the CBAs incorporated the County's 1990 HWBP, which addressed the cost of retiree health care and included a reservation of rights clause providing that Wayne County could unilaterally modify "health benefit provisions applicable to retirees"; and

(4)  Because Plaintiffs' health care plan contribution liability was tied to that of the pre-Act 312 Award retirees—and the pre-Act 312 Award retirees' health care plan contribution liability was subject to change under the 1990 HWBP—when Wayne County required the pre-Act 312 Award retirees to contribute to the premium cost of their health insurance, Plaintiffs were appropriately also required to contribute to these costs.

The District Court held that the MOAs' language tied Plaintiffs' health care insurance premium obligations to the prior retirees and did not promise premium-

{01680277}                                    14

free health insurance for life. The District Court accordingly dismissed all of Plaintiffs' claims, including Plaintiffs' § 1983 claim since that claim was contingent on Plaintiffs having a property interest provided by the MOAs—i.e., lifetime, premium-free health insurance—which the Court found Plaintiffs did not have.

Because the District Court ruled in favor of Defendants on its tying argument, the District Court did not address Defendants' other arguments in favor of summary judgment. But since this Court will be reviewing this matter *de novo*, Defendants are relying on all of the arguments they raised below.

The first of these additional arguments is that even if for the sake of argument the MOAs at issue did promise Plaintiffs premium-free health insurance, they did not promise Plaintiffs premium-free health insurance *for life*. The Supreme Court has made clear in its recent decision in *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761 (2018), that under the ordinary rules of contract interpretation, contractual obligations to provide retiree benefits cease upon the termination of the contract that conferred them unless the contract specifies otherwise. Here, the language of the contracts at issue did not provide for "vested" or "lifetime" benefits and, therefore, whatever rights Plaintiffs had under the MOAs with respect to their health insurance premiums expired when those contracts expired.

Next, Plaintiffs' § 1983 claim is improper even if the MOAs did in fact create lifetime right to premium-free health care insurance.  As this Court recently confirmed in *Kaminski v Coulter*, 865 F.3d 339 (6th Cir. 2017), a claim for a due-process violation does not lie where the plaintiff's claim is simply for a breach of contract, especially where the only basis for federal jurisdiction is that a state actor is one of the contracting parties.  Rather, under these circumstances a state breach of contract action provides an adequate remedy.  Here, Plaintiffs argue that Wayne County breached its contractual obligation to provide them with premium-free health care insurance for life and they are attempting to transform this contractual claim into a constitutional claim.  But Plaintiffs cannot convert their state law contract claim into federal constitutional claim simply because a state actor is one of the contracting parties.  Their breach of contract claim provides an adequate remedy for the alleged breach.

Further, even if this Court found that Plaintiffs had a contractual right to lifetime premium-free health care insurance and Plaintiffs could bring a § 1983 claim against Wayne County for depriving them of this property interest, Plaintiffs' claims against the individual defendants, Evans and Ficano, would still have to be dismissed.

{01680277}                                16

First, Evans and Ficano are not parties to the MOAs, so they cannot be liable for breach of these agreements.

Second, Plaintiffs have brought the same claims against Evans and Ficano in their official capacity as they brought against Wayne County. The Supreme Court has ruled that under such circumstances, a successful plaintiff cannot execute on the assets of the official to recover a judgment; rather, the plaintiff must look to the assets of the public entity. The claims against Evans and Ficano are therefore redundant and require dismissal.

Third, qualified immunity protects Evans and Ficano because, at minimum, it is unclear whether Plaintiffs' claimed interest is constitutionally protected and the Supreme Court has held that governmental officials are shielded from liability unless that official violated a clearly established constitutional right.

The last issue is Plaintiffs' allegation that the District Court erred in not granting their Motion for Reconsideration of the Court's dismissal of their case based on a theory of promissory estoppel. Plaintiffs never raised this theory: in their original Compliant; in their subsequent four Amended Complaints; in their Response Brief in opposition to Defendants' Motion for Summary Judgment; nor at oral argument on said Motion. The District Court correctly determined that Plaintiffs could not raise this new claim after Plaintiffs' claims were already

dismissed.  Moreover, even if Plaintiffs had properly alleged a promissory estoppel claim, under Michigan law this claim would not be permitted because subject of the alleged promise—i.e., the amount of Plaintiffs' contribution for their health insurance premiums in retirement—is already the subject of a written contract.  In short, Plaintiffs cannot permissibly bring an implied contract claim for issues already covered by an express contract.

## Arguments

### I.    Standard of Review.

This Court reviews a district court's grant of summary judgment *de novo*. *Domingo v. Kowalski*, 810 F.3d 403, 410 (6th Cir. 2016).  Construing the evidence in the light most favorable to the nonmovant, *Villegas v. Metro. Gov't of Nashville*, 707 F.3d 563, 568 (6th Cir. 2013), summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and movant is entitled to judgement as a matter of law."  Fed. R. Civ. P. 56(a).  This standard of review applies to all of the arguments addressed in this brief.

### II.    Plaintiffs' breach of contract claim fails because the MOAs did not promise premium-free health insurance, let alone premium-free health insurance for life.

Agreements negotiated by labor unions on behalf of their membership are to be interpreted according to ordinary principles of contract law.  *Reese*, 138 S. Ct.

763; *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015); *Gallo v. Moen Inc.*, 813 F.3d 265, 268 (6th Cir. 2016).[4] It is well established that "[t]he first and best way to divine the intent of the parties is from the four corners of their contract and from traditional canons of contract interpretation." *Gallo*, 813 F.3d at 273. Therefore, absent ambiguity in the contract, "no basis for going beyond the contract's four corners exists." *Id.* at 274; *see also Tackett*, 135 S. Ct. at 933, 938 (stating that "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent" and "[w]hen the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further").

A.    <u>The MOAs unambiguously tied Plaintiffs' health insurance premium liability to that of the pre-Act 312 Award retirees rather than stating that their health insurance would be premium-free.</u>

Plaintiffs' entire lawsuit—including their § 1983 claim—is premised on their claim that the MOAs provided that they would never have to make any contributions to the cost of their health insurance premiums. (Plaintiffs' Fourth

---

[4] Michigan courts have recognized that "the Supreme Court's reasoning in *Tackett* is consistent with Michigan's contract jurisprudence regarding CBAs." *Harper Woods Retirees' Ass'n v. City of Harper Woods*, 312 Mich. App. 500, 511-514 (2015); *see also Serafino v. City of Hamtramck*, 707 Fed. Appx. 345, 352 (6th Cir. 2017) (applying *Tackett* and *Gallo* to a Michigan CBA breach of contract action and finding that Michigan courts "have unanimously endorsed *Tackett*'s reasoning in both the private- and public sector context").

Amended Complaint, R. 41, ¶¶ 1, 7, 11-13, 17-20, 25, 26, & 28, Page ID # 305-315).  Yet while Plaintiffs claim to find this promise in the MOAs, the plain language of the MOAs promised no such thing.

Regarding Local 3317, the relevant language states that the MOA retirees "will be allowed to retire with the same health care plan contribution liability as individuals who retired on or before the issuance of the May 2, 2007 Act 312 Award."  (October 2008 MOA, R. 44-5, ¶ 3, Page ID # 1223).  The POAM MOA similarly states that eligible POAM members "will be allowed to retire with the same health care plan premium contribution liability as individuals who retired prior to January 1, 2008."  (POAM MOA, R. 44-5, ¶ 3, Page ID # 1242).

Based on the quoted language, it is evident that the County did not promise the MOA retirees that their health insurance would be premium-free.  Instead, the parties expressly tied the MOA retirees' "contribution liability" to the "contribution liability" of those individuals who retired prior to May 2, 2007 for Local 3317 and January 1, 2008 for POAM.[5]  Therefore, there is no doubt that the MOAs tied

---

[5] Further, it is not disputed that: (1) the phrase "health care plan…contribution liability" refers to health insurance premium contributions; and (2) the "individuals" who retired before the dates identified in the MOAs are those retirees who retired prior to the respective Act 312 Awards applicable to each union.  (*See, e.g.,* T. Taylor Dep., R. 44-5, at 23:16-24:18, Page ID # 1278-1279; M. Royal Dep., R. 44-2, at 38:12-20; 79:14-25, Page ID # 704, 708; K. Grabowski Dep., R. 44-5, at 38:17-40:2, Page ID # 1219-1221; L. Calderoni Dep., R. 44-5, at 53:8-13, Page ID # 1248).

Plaintiffs' health insurance premium liability to the liability of the union members who retired before the issuance of the Act 312 Awards, not that the County promised Plaintiffs premium-free health insurance.

Indeed, had it been the parties' intent to provide Plaintiffs premium-free health insurance for life, they would have expressly said so. For example, the MOAs could have said that "eligible employees retiring under this agreement shall not be required to contribute to the cost of their health insurance premiums in retirement." But the MOAs did not state this nor anything similar. Instead, they unambiguously tied Plaintiffs' premium contribution liability to the liability of other retirees.

B. <u>Because the 1990 HWBP permitted the County to require prior union retirees to contribute to the cost of their health insurance premiums, Plaintiffs were also contractually required to contribute</u>.

Given that the MOAs expressly tied Plaintiffs' premium contribution liability to the liability of the pre-Act 312 Award retirees, the next step in the analysis is to determine whether the County had the right to require the pre-Act 312 Award retirees to contribute to the cost of their health insurance premiums.

It is undisputed that the 2000-2004 CBAs for Local 3317 and Local 502 (the predecessor to POAM) are the CBAs that applied to the pre-Act 312 Award retirees. (M. Royal Dep., R. 44-2, at 49:15-18; 79:14-80:18, Page ID # 705, 708-709; P.

Melton Dep., R. 44-2, at 25:6-11, Page ID # 689; W. Thompson Dep., R. 44-3, at 58:18-25, Page ID # 978).  It also cannot be disputed that neither of the 2000-2004 CBAs address health insurance premiums for retirees and, instead, the incorporated 1990 HWBP governs health care benefits for the 2000-2004 CBA retirees.  (1990 HWBP, R. 44-2, § 6, Page ID # 683).  And because the 1990 HWPB contains a clause reserving the County's "right to modify, amend, replace and/or discontinue any retiree health benefit provisions applicable to retirees," the County had the legal authority to require the pre-Act 312 Award retirees to contribute to the cost of the their health insurance premiums.  (1990 HWBP, R. 44-2, § 8, Page ID # 685).

Since the MOAs tied Plaintiffs' health insurance contribution liability to the liability of the pre-Act 312 retirees, it is axiomatic that if the pre-Act 312 retirees' premium liability changed, so too would Plaintiffs' premium liability.  Indeed, that is precisely what occurred.  When Plaintiffs retired, the pre-Act 312 Award retirees were not required to contribute to the cost of their health insurance premiums, so Plaintiffs too were not required to contribute.  But in 2014, when the County exercised its authority under the 1990 HWBP's reservation of rights clause to require the pre-Act 312 Award retirees to contribute to the cost of their premiums, Plaintiffs were likewise obligated to contribute the same amount.[6]

_____

[6] The concept of Plaintiffs' premium contribution liability mirroring the liability of

In sum: (1) under the unambiguous language of the MOAs, Plaintiffs were required to contribute the same amount toward the cost of their insurance premiums as the individuals who retired before the Act 312 Awards; (2) while the individuals who retired before the Act 312 Awards were not making premium contributions when the MOAs were executed, the County had the right to impose contribution liability on them under the 1990 HWBP; and (3) Plaintiffs were thus not guaranteed premium-free health insurance.  Instead, the import of the MOAs is that if the County required premium contributions from the pre-Act 312 retirees, Plaintiffs would likewise have that same liability.  Because Plaintiffs' breach of contract claim is entirely based on the erroneous assertion that the MOAs guaranteed they would never have to make premium contributions, summary judgment was properly granted in Defendants' favor.

   C.   <u>The MOAs do not promise any lifetime benefits, even if they promised that Plaintiffs would receive premium-free health insurance</u>.

---

the pre-Act 312 Awards retirees was not new to the parties.  The 2008-2011 CBAs provide that "[e]mployees who retire from County service who are eligible for post-retirement health care benefits shall participate in the same health care plan options, coverages, co-pays, deductibles, etc. as active employees covered by this, or any subsequent, collective bargaining agreement."  (*See, e.g.*, POAM 2008-2011 CBA, R. 44-4, § 31.02(D), Page ID # 1167).  This language reveals that the parties clearly understood (and contemplated) the "tying" concept at the time the MOAs were negotiated.

Even if Plaintiffs were able to demonstrate that their health insurance premium obligations were not tied to the prior retirees identified in the MOAs, the MOAs—and the related 2008-2011 CBAs—do not provide *lifetime* premium-free health insurance. Indeed, whatever rights Plaintiffs had under the MOAs with respect to their contribution for health care insurance have long since expired.

In *Tackett*, *supra*, and *Reese*, *supra*, the United States Supreme Court explicitly rejected any presumption of lifetime benefits; instead, contracts in the labor relations context must be interpreted according to what they actually state. *See, e.g., Tackett*, 135 S. Ct. at 935 (rejecting prior case law that "plac[ed] a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements" as violating "ordinary principals of contract law" and "distort[ing] the attempt to ascertain the intent[] of the parties"); *Reese*, 138 S. Ct. 763-766 (recognizing that in the ordinary course contractual obligations cease upon the termination of the bargaining agreement and rejecting inferences of lifetime benefits where the contract does not specifically so provide); *see also Gallo*, 813 F.3d at 268-269 (recognizing the Supreme Court's direction in *Tackett* and, in finding there was no promise of lifetime benefits, stating that "what mattered" was that the subject agreements did not commit to providing unalterable health care benefits for life).

Indeed, the Supreme Court has emphatically rejected the prior inferences under *Yard-Man*, *infra*—and any vestiges of such inferences—that "when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Int'l Union v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983). In *Tackett,* and again in *Reese*, the Supreme Court highlighted that *Yard-Man* "failed to consider the traditional principle that contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement" and instructed that "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Tackett,* 135 S. Ct. at 937; *Reese*, 138 S. Ct. at 763-766.

In *Gallo*, *supra*, this Court applied the Supreme Court's direction in *Tackett* under circumstances very similar to this case. The agreement at issue in *Gallo* stated that the employer, Moen, "shall continue" to provide health insurance coverage "as indicated under [a terminated] Collective Bargaining Agreement." *Gallo*, 813 F.3d at 267. Moen provided these benefits during the time-period when the earlier, terminated CBA would have otherwise been effective—and even beyond the CBA's natural termination date—but Moen ultimately decreased the retirees' benefits. *Id*. The plaintiff retirees argued that Moen breached its

obligations by so doing because the agreement provided for lifetime benefits. *Id*.

In rejecting the retirees' argument that the agreement provided benefits for life, this Court first highlighted that there was no language in the contracts making a commitment to provide lifetime benefits. *Id*. at 269 (stating "*[f]irst and foremost*, nothing in this or any of the other CBAs says that Moen committed to provide unalterable health care benefits to retirees and their spouses for life. ***That is what matters, and that is where the plaintiffs fall short***") (emphasis added). Indeed, this Court rejected the plaintiffs' claim that the use of words like "will be provided" or "will be covered" evidenced an intent to provide future benefits, concluding that "the use of the future tense without more—without words committing to retain the benefit for life—does not guarantee lifetime benefits." *Id.* at 271.

This Court also emphasized that while the agreements did not provide a specific end date for the provision of health care benefits, "[w]hen a specific provision of the CBA does not include an end date, we refer to the general durational clause to determine that provision's termination." *Id.* at 269. To this end, this Court held that "[a]bsent a longer time limit in the context of a specific provision, ***the general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends***.'" *Id*. (emphasis added). And because the agreement to provide health care benefits did not include an end date, the general durational

clause of the relevant CBAs applied to the agreement, meaning that Moen's obligation to provide the health care benefits at issue terminated upon expiration of the CBAs. *Id.*

This Court also rejected the plaintiffs' argument that the language tied pension benefits to health care—thereby implying a lifetime benefit—by concluding that simply tying health care eligibility to receiving a pension did not mean the health care was promised for life. *Id*. at 272.

The reasoning in *Gallo* has been fully endorsed by the Supreme Court in *Reese*. In *Reese*, the Supreme Court emphasized that silence in contracts as to the duration of a provision must not be interpreted to mean that the benefits are vested—or that this silence can even create an ambiguity regarding whether the benefits were intended to be for a lifetime—and that tying retiree benefits to pensioner status cannot create an inference that the benefits are intended be vested for life. *Reese*, 138 S. Ct. at 763-766.

> 1. *Applying Reese, Tackett, and Gallo to this case, it is evident that the MOAs do not provide Plaintiffs with premium-free health insurance for life.*

First, it is indisputable that the MOAs do not use the words "vested" or "lifetime" with respect to Plaintiffs' premium contribution liability. Therefore, while Plaintiffs claim an immutable right to premium-free health insurance, the

MOAs never make that commitment even though they could have easily done so. This fact alone eviscerates Plaintiffs' claim. *See Reese*, 138 S. Ct. at 766 (in finding that the subject CBA did not provide lifetime benefits, stating that "[i]f the parties meant to vest health care benefits for life, they easily could have said so in the text. But they did not"); *see also Gallo*, 813 F.3d at 269 ("*First and foremost*, nothing … says that Moen committed to provide unalterable health care benefits to retirees … for life.  That is what matters, and that is where the plaintiffs fall short") (emphasis in the original).

Second, *Reese* and *Gallo* instruct that when a specific provision does not include an end date, courts refer to "the general durational clause to determine that provision's termination" and that if a specific provision does not contain a longer time-period, "the general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends.'"  *Gallo*, 813 F.3d at 269; *Reese*, 138 S. Ct. at 763-766 (emphasizing the *Yard-Man* error of failing to apply general durational provisions to all clauses within the contract unless the clause contains a specific durational provision).[7]

---

[7] The Supreme Court has also found that even where contracts are silent as to their duration (i.e., with no general durational clause), they are not treated as operative in perpetuity, but as operative for a "reasonable time." *Reese*, 138 S. Ct at 763-764.

Here, the MOAs do not contain a specific end date with respect to the health insurance premium liability provision. In fact, they did not contain a specific end date all. As such, it is necessary to look to the general durational clause contained in the 2008-2011 CBAs for the termination date of the obligations in the MOAs because, except to the extent specifically modified by the MOAs, it is undisputable that the 2008-2011 CBAs otherwise applied to Plaintiffs. The MOAs provide that no other terms of 2008-2011 CBAs are modified by the MOAs and the MOAs are even entitled "RE: 2008-2011 COLLECTIVE BARGAINING AGREEMENT – RETIREMENT INCENTIVE PROGRAM." (October 2008 MOA, R. 44-5, Page ID # 1223; POAM MOA, R. 44-5, Page ID # 1242). Further, Plaintiffs' other retirement benefits, including their right to "participate in the same health care plan options, coverages, co-pays, deductibles, etc. as active employees covered by this, or any subsequent collective bargaining agreement" were governed by the 2008-2011 CBAs. (Local 3317 2008-2011 CBA, R. 44-4, § 37.02(D), Page ID # 1057; POAM 2008-2011 CBA, R. 44-4, § 31.02(D), Page ID # 1167). Together, this shows that the union members' benefits in retirement were subject to the 2008-2011 CBAs except as modified by the MOAs. And where there is no language in the MOAs extending the County's obligations with respect to the Plaintiffs' health insurance premiums beyond the term of the 2008-2011 CBAs under with Plaintiffs'

retired, pursuant to the clear direction of the Supreme Court, those benefits ceased when those CBAs terminated under their general durational provisions.

The 2008-2011 CBAs under which Plaintiffs retired have, in fact, expired pursuant to their general durational clauses.[8]  So regardless of whether the MOAs promised $0.00 premiums or whether they tied Plaintiffs' premium liability to those prior retirees identified in the MOAs, the County's obligations regarding Plaintiffs' premium contribution liability under the MOAs have terminated.

> 2. *Plaintiffs' "evidence" that the parties intended the MOAs to provide a lifetime benefit with respect to their health insurance premiums is unavailing.*

In opposition to the compelling evidence that the parties did not contract for lifetime premium benefits, Plaintiffs point to two items in their Complaint that they believe demonstrate the County's promise to never impose premium contributions.

Plaintiffs first highlight that the County did not deduct insurance premiums from MOA retirees until 2014, implying that this evidences that the County must

---

[8] Both the Local 3317 and the POAM 2008-2011 CBAs provide that they remain in effect through September 30, 2011 but would continue unless either the County or the unions provided notice of their desire to modify, amend, or terminate the CBAs. (Local 3317 2008-2011 CBA, R. 44-4, § 45.01, Page ID # 1090; POAM 2008-2011 CBA, R. 44-4, § 45, Page ID # 1211).  It is undisputed that such notice was given with respect to each CBA, and Local 3317 and POAM both entered into subsequent CBAs with the County.  (The subsequent Local 3317 2011-2014 CBA and POAM 2011-2016 CBA are respectively attached as **Exhibits 2** and **3** to Defendants/Appellees' contemporaneously filed Motion to Take Judicial Notice.)

have had a continuing obligation not to charge them for a portion of their health insurance premiums subsequent to the expiration of the 2008-2011 CBAs. (Plaintiffs' Fourth Amended Complaint, R. 41, ¶¶ 19, 25, Page ID # 312, 314). But this same argument was rejected in *Gallo*.

In that case, the plaintiffs pointed to the fact that "Moen continued providing health care benefits for five years after the plant closing agreement expired, claiming that this shows the parties' 'inten[t]' to create vested and unalterable retiree health care benefits." *Gallo*, 813 F.3d at 273. The Sixth Circuit rejected this argument because—regardless of Moen voluntarily providing benefits after the CBAs expired—the language of the agreement and canons of contract interpretation "offer[ed] no evidence of any intent to fix these benefits permanently into the future. Absent ambiguity from this threshold inquiry, no basis for going beyond the contract's four corners exists." *Id.* at 273-274. Nevertheless, the court went on to state that:

> a company does not act inconsistently when (1) it continues paying health care benefits to retirees and (2) reserves the right to alter or eliminate those benefits in the future. That a company to its credit hopes to subsidize health care benefits for its retirees as long as possible does not mean it has promised to do so, and above all such action does not mean that it has no right to alter those benefits in the future.
>
> *Id.*

So here too, the County's voluntary decision to continue providing health insurance to Plaintiffs without any premium contributions after the expiration of the 2008-2011 CBAs does not mean the County *promised* to do so forever or that it had no right to alter that benefit in the future. Indeed, the salient issue is whether the agreements themselves promised lifetime benefits, which the MOAs do not.

Plaintiffs also allege that their right to premium-free health insurance is "vested" because it is "specifically linked to the pension article and clauses contained in their respective collective bargaining agreements and memorandum [sic] of agreements." (Plaintiffs' Fourth Amended Complaint, R. 41, ¶ 24, Page ID # 314). Notably though, Plaintiffs cite no actual language tying premiums to pension benefits, so this argument is baseless for this reason alone. Nevertheless, even if there was a relationship between the premium contribution provisions and pension benefits, this alone is insufficient to demonstrate that Plaintiffs would never be required to contribute to the cost of their premiums. *Reese*, *Tackett*, and *Gallo* all "rejected this kind of 'tying' analysis as a relic of a misdirected frame of reference, calling it one of many *Yard-Man* inferences that was 'inconsistent with ordinary principles of contract law.'" *Gallo*, 813 F.3d at 272 (quoting *Tackett*, 135 S. Ct. at 937); *Reese*, 138 S. Ct at 764 (rejected the *Yard-Man* inference of retiree benefits being tied to pension benefits). Again, the relevant issue is what the

agreements themselves promise, not an inference to be divined from a reference to pension benefits (which reference, in this case, does not even exist anyway).

In sum, Plaintiffs have asked that it be inferred that the MOAs' language regarding premiums was intended to provide lifetime benefits, thereby requesting the application of *Yard-Man* inferences. But given the Supreme Court's decisions in *Reese* and *Tackett*, such inferences are not permitted. So to prevail on their claims, Plaintiffs must be able to point to language promising them premium-free health insurance for life. But no such promise to a lifetime benefit regarding Plaintiffs' health insurance premiums exists. Therefore, any obligation Wayne County had with respect to Plaintiffs' insurance premiums terminated with the 2008-2011 CBAs, regardless of whether it was an obligation to provide Plaintiffs with premium-free health care or whether Plaintiffs' premium contributions were tied to those of the pre-Act 312 Award retirees. For this reason too, this Court should affirm the District Court's dismissal of Plaintiffs' claims.

## III.    Plaintiffs' due process claim is baseless as a matter of law.

Plaintiffs allege that the County's failure to provide them with premium-free health care gives rise to a claim under 42 U.S.C. § 1983 for "unconstitutional deprivations of property interest without due process." (Plaintiffs' Fourth Amended Complaint, R. 41, Page ID # 309). But an essential element of an action under §

1983 is the existence of a constitutionally protected property interest. *Bd. of Regents v. Roth*, 92 S. Ct. 2701, 2705 (1972); *Ramsey v. Board of Educ.*, 844 F.2d 1268, 1271 (6th Cir. 1988). And since the MOAs do not provide Plaintiffs with premium-free health care for life, Plaintiffs' due process claim necessarily fails since they cannot have a property interest in a non-existent benefit. *Serafino v. City of Hamtramck*, 2016 U.S. Dist. LEXIS 132055, at *23 (E.D. Mich. Sept. 26, 2016) (finding where the CBAs did not promise lifetime retiree health care, the plaintiffs could not rely on them for their claimed protected property interest, and the plaintiffs' due process claim therefore failed) (R. 44-5, Page ID # 1289).

Further, even if for the sake of argument the MOAs promised Plaintiffs premium-free health care for life, not every deprivation of a property interest gives rise to a constitutional claim. *Ramsey*, 844 F.2d at 1272. To the contrary, "when the deprivation is a simple breach of contract and there is [an] adequate state breach of contract action available as a remedy," a § 1983 claim is barred. *Id.* at 1273; *see also Kaminski*, 865 F.3d at 348 (finding that "[o]ur case law makes clear that a claim for a due-process violation does not lie where the thrust of the plaintiffs' argument is simply breach of contract"). A breach of contract remedy is adequate when "an employee deprived of a property interest in a specific benefit … suffers a loss which is defined easily." *Ramsey*, 844 F.2d at 1274. As such, this Court has held that "a

pure benefit of employment, as opposed to an interest in the tenured nature of the employment itself, is an interest that can be and should be redressed by a state breach of contract action and not by a federal action under section 1983." *Id.* at 1273-1275 (also stating that "it is neither workable nor within the intent of [§] *1983* to convert every breach of contract claim against a state into a federal claim"); *see also Kaminski*, 865 F.3d at 348 (stating that "[b]ecause a due-process claim is predicated on the deprivation of a constitutionally protected interest *without due process of law*, the availability of a state breach-of-contract remedy defeats the due-process claim") (emphasis in the original); *Sharp v. Lindsey*, 285 F.3d 479, 489 (6th Cir. 2002) (holding that "[w]e see no justification for turning [plaintiff's] ordinary breach of contract action into a federal constitutional case" where the plaintiff's contract of employment was terminated).[9]

Plaintiffs have the burden of establishing that their claimed interest is constitutionally protected. *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007). This, they cannot do. Plaintiffs are simply seeking damages for the County's alleged breach of contract in requiring them to contribute to the

---

[9] It should be noted that despite Plaintiffs' failure to recognize *Kaminski* in their brief, Plaintiffs' counsel is perfectly aware of *Kaminski*'s holding since he was also counsel for the plaintiffs in that case.

cost of their insurance premiums. Because this is a "specific benefit" that is clearly quantifiable, it is precisely the type of interest that is adequately remedied by a breach of contract action and, therefore, should not be redressed under § 1983.[10]

## IV. The claims against Evans and Ficano should be dismissed regardless of whether Plaintiffs' claims are legitimate as to Wayne County.

First, Plaintiffs' breach of contract claims against Evans and Ficano must be dismissed because they are not parties to the MOAs. As non-parties, it is incontestable that they cannot be contractually liable for the alleged breach of the MOAs. *See, e.g.*, *Dunn v. Bennett*, 303 Mich. App. 767, 774; 864 N.W.2d (2014) (stating that one of the elements of a breach of contract action is that the other party to the contract breached the contract).

Second, a claim against an official of a public entity acting in their official capacity is a claim against the public entity, and a prevailing plaintiff must look to recover any damages awarded in a judgment from the public entity itself, not from the official personally. *Kentucky v. Graham*, 105 S. Ct. 3099, 3105 (1985). Given that Plaintiffs have sued the relevant public entity, the claims against Ficano and Evans in their official capacities are redundant and should be dismissed. *Id.*

---

[10] Moreover, to the extent that Plaintiffs are making a substantive due process claim, there is no question that the contractual benefit claimed by Plaintiffs does not rise to the level of "fundamental" interest protected by substantive due process. *Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir. 1990).

Third, Evans and Ficano cannot be liable for Plaintiffs' unconstitutional deprivation of property interest claim because they are protected by qualified immunity, which is described by the Supreme Court as follows:

> Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right…

> *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (internal quotations and citations omitted).

So to prevail on their claims against Evans and Ficano, Plaintiffs must establish that they had a protected property interest in receiving lifetime, premium-free health insurance and that their property interest was clearly established when they were required to contribute their premium costs. Plaintiffs cannot establish this.

While a collective bargaining agreement may create a protected property interest, as discussed previously, not every interest created by a contract with a public entity gives rise to a constitutionally protected property interest. Otherwise, federal courts would be required to decide the procedural fairness of every ordinary contract claim against a public entity.

In *City of Pontiac Retired Emps. Ass'n v, Schimmel*, 726 F.3d 767, 788 (6th Cir. 2013), the plaintiffs were retired former employees of Pontiac who claimed, among other things, a federally protected property interest in lifetime changing health care benefits. In deciding the case, the majority declined to address this issue, but as is relevant to the issue before this Court, the dissent recognized that "it is unclear whether there can be a property interest in lifetime, unchanging health care benefits." *Schimmel*, 726 F.3d at 788.

Indeed, in one of the cases cited by the *Schimmel* dissent, *Bell v. Westmoreland Cent. Sch. Dist.,* 1991 U.S. Dist. LEXIS 3063 (N.D.N.Y. 1991) (R. 44-5, Page ID # 1291-1296), the court provided a detailed analysis of this issue with respect to whether the plaintiff's claim to life-time, premium-free health insurance was a protected property interest. The court explained how not every contractual interest creates a protected property right and found that only where the interest arises to a protected status—as with a welfare recipient, or tenured employment— does the interest arise to one that has constitutional protection. *Id.* at *6-12 (Page ID # 1294-1296) (finding that the further the contractual claim is from an interest as central to the individual as employment, the more difficult it is to extend it constitutional protection without subsuming the entire state law of public contracts). Based on this analysis, the *Bell* court found that "there can be no doubt that a

constitutionally protected property interest in the continuation of post-retirement health insurance benefits does not exist." *Id.* at 10 (Page ID # 1295).

As such—and as recognized by the dissent in *Schimmel*—it is evident that, at minimum, it is unclear whether Plaintiffs' claimed interest is constitutionally protected. And because this is the case, Evans and Ficano are protected by qualified immunity.

## V.    Plaintiffs' arguments in their Brief of Appeal fail to provide any basis for reversing the District Court's dismissal of their claims.

In their Brief on Appeal, Plaintiffs fail to directly address the arguments made above, including the arguments that the District Court agreed with in dismissing Plaintiffs' claims. Instead, Plaintiffs: (1) argue that the District Court improperly did not consider a claim—i.e., promissory estoppel—that Plaintiffs admit was not specifically alleged in any of the five versions of their complaints; and (2) with respect to the two claims actually made in their complaints, Plaintiffs raise entirely new positions not asserted below as to why these claims should not have been dismissed or misconstrue said claims and the facts. The arguments made by Plaintiffs in their Brief are improper and otherwise lack any legal merit.

{01680277}                                   39

A.   The District Court properly rejected Plaintiffs' Motion for Reconsideration asserting that they alleged a claim for promissory estoppel.

Plaintiffs filed a total of five complaints in this matter—the original complaint and four amended complaints. (Original Complaint, R. 1, Page ID # 1-11; First Amended Complaint, R. 11, Page ID # 74-82; Second Amended Complaint, R. 18, Page ID # 107-118; Third Amended Complaint, R. 33, Page ID # 244-255; Fourth Amended Complaint, R. 41, Page ID # 305-316).  In none of these complaints did Plaintiffs allege a claim of promissory estoppel.  Instead, in each complaint Plaintiffs allege a count for "Unconstitutional Deprivation of Property Interest without Due Process under the 14th Amendment of the U.S. Constitution, without Just Compensation – 42. [*sic*] U.S.C. § 1983" and "Breach of Contract." (*See, e.g.*, R. 41, Page ID # 309-315).  Further, nowhere in their response to Defendants' Motion for Summary Judgment did Plaintiffs reference any promissory estoppel claim, nor did they raise promissory estoppel at oral argument on Defendants' Motion for Summary Judgment.

Yet, when the District Court ruled in Defendants' favor on Summary Judgment, they filed a Motion for Reconsideration requesting that the Court reconsider its decision based on the theory of promissory estoppel.  The District Court refused to do so, and Plaintiffs now assert this was a reversible error because

{01680277}                                    40

within one paragraph of their Fourth Amended Complaint, they allegedly assert the elements of promissory estoppel.   Plaintiffs' position is incorrect for two fundamental reasons.

First, under no reasonable reading of Plaintiffs' complaints can one divine that Plaintiffs intended to bring a promissory estoppel claim.  Indeed, the single paragraph of their Fourth Amended Complaint that Plaintiffs rely on for their position that they brought a promissory estoppel claim—paragraph 18—is actually a paragraph *within* their breach of contract count.  (R. 41, Page ID # 311-313).  And any reasonable reading of Plaintiffs' breach of contract count—including paragraph 18—is that the promise to which Plaintiffs refer is the alleged promise that they would not be required to pay medical insurance premiums *as provided in the MOAs*. This is the entire crux of Plaintiffs' breach of contract claim.  In short, there is nothing in the Fourth Amended Complaint—or any of the earlier complaints—that would suggest that Plaintiffs intended to bring a claim based on promissory estoppel.  And "[b]ecuase there is no duty [on the part] of the trial court or appellate court to create a claim which appellant has not spelled out in his pleading," *Clark v. National Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975), the District Court properly did not consider Plaintiffs' non-existent promissory estoppel claim.

Second, and just as important, even if Plaintiffs had brought a promissory estoppel claim, it would have been precluded by the existence of the MOAs, which cover precisely the same subject matter as the alleged promise Plaintiffs assert provides the basis for promissory estoppel.  This is because it is well settled that "[f]or the court to apply promissory estoppel under Michigan law, it must find that an implied agreement exists between the parties, *in the absence of an express contract*."  *APJ Assocs. v. N. Am. Philips Corp.*, 317 F.3d 610, 616 (6th Cir. 2003) (emphasis added) (stating also that "[p]romissory estoppel may not be used to override the express agreement of the parties contained in written agreements"); *Gore v. Flagstar Bank, FSB*, 474 Mich. 1075, 1078; 711 N.W.2d 330 (2006) (dissent stating that "promissory estoppel does not apply if the performance that satisfies the detrimental reliance requirement of the promissory estoppel claim is the same performance that represents consideration for the written contract" and "if there is an existing contract between the parties, one party is not given the proverbial second bite of the apple"); *Briggs v. Univ. of Detroit-Mercy*, 22 F. Supp. 3d 798 (E.D. Mich. 2014) (finding that "under Michigan law, an implied contract cannot be enforced where an express contract is in effect between the parties covering the same subject matter"); *Goss v. CitiMortgage, Inc.*, 2017 U.S. Dist. LEXIS 189604, at 12 (E.D. Mich. 2017) (stating that "[p]romissory estoppel is … inapplicable

where the parties are bound by an express written agreement"). Indeed, even the case Plaintiffs quote in their Brief states that "[t]his Court has held that no action for promissory estoppel may lie when an oral promise expressly contradicts the language of a binding contract." *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 280 Mich. App. 16, 41; 761 N.W.2d 151 (2008).

Here, the only promise that Plaintiffs claim was made to them was that they would be entitled to premium-free health care for life—precisely the same promise they assert is made in the MOAs. And because the MOAs govern Plaintiffs' rights with respect to their obligations relative to their health insurance premiums, Plaintiffs cannot assert an implied contract with respect to that very same issue. As such, even if Plaintiffs had made a promissory estoppel claim, it would necessarily fail as a matter of law.[11]

---

[11] In their Brief, Plaintiffs also take the position the promissory estoppel is a "doctrine," apparently as opposed to a cause of action. Although the argument is not expressly made, it appears Plaintiffs are suggesting that because promissory estoppel is a "doctrine," they need not have specifically plead promissory estoppel in their complaints. Plaintiffs cite no authority for this curious position and Defendants assert that there is no legal basis for it.

B.   <u>Plaintiffs' arguments regarding the claims actually made in their</u>
<u>complaints fail to provide any legal basis for reversing the District</u>
<u>Court's decision to grant Summary Judgment in Defendants' favor.</u>

1.   *<u>Plaintiffs' "pension" benefits are irrelevant to their claims.</u>*

Plaintiffs asserts in their "Argument #1" that the District Court committed a reversible error with respect to "vested pension (and medical) benefits created by contract." (Plaintiff's Brief on Appeal, p. 9). But this case is not about "vested pension benefits." Indeed, this case had nothing to do with pension benefits. Moreover, for the reasons discussed previously, by the plain terms of the MOAs, no benefits that Plaintiffs claim are "vested," and Plaintiffs' theory that their benefits under the MOAs are tied to pension benefits and are therefore vested has been soundly rejected by the Supreme Court.

2.   *<u>The District Court necessarily determined that Plaintiffs' § 1983</u>*
*<u>claim failed when it decided that Plaintiffs had no contractual</u>*
*<u>right to lifetime, premium-free health insurance</u>*.

Plaintiffs assert that the District Court failed to address their § 1983 claim when it granted Summary Judgment. (Plaintiff's Brief on Appeal, pp. 9-14). But, as explained previously, the District Court did address this claim. Plaintiffs could only make a § 1983 claim if they were deprived of a property right. Here, the property right Plaintiffs claim is the right to lifetime premium-free health insurance. Setting aside whether there is even a constitutionally protected property interest in

{01680277}                                    44

the continuation of post-retirement health insurance benefits, if the MOAs do not create such an interest—which the District Court found they do not—then it is apparent that Plaintiffs have no property interest that could support a § 1983 claim.

> 3. *Plaintiffs' argument that the MacDonald settlement agreement applies to them is untimely and otherwise does not support their position that they are entitled to premium-free health insurance for life*.

In two separate sections of their brief, Plaintiffs argue that a 2015 settlement agreement between the County and a class of former retirees (the MacDonald settlement class) applies to them and, as a result, the benefits they are claiming in this matter became vested. (Plaintiffs' Brief on Appeal, pp. 14-15, 17-18).

As an initial matter, Plaintiffs never raised any argument regarding the MacDonald settlement or the alleged effect of that settlement on Plaintiffs' rights under the MOAs in the District Court, including in their briefing in response to Defendants' Motion for Summary Judgment nor in oral argument with respect to same. "It is well-settled that issues not presented to the district court but raised for the first time on appeal are not properly before this Court." *Kusens v. Pascal Co.*, 448 F.3d 349, 368 (6th Cir. 2006). Indeed, "[t]he failure to present an issue to the district court forfeits the right to have the argument addressed on appeal." *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006). "[T]his Court's 'function is to review the case presented to the district court, rather than a

better case fashioned after an … unfavorable order.'" *Kusens*, 448 F.3d at 368 (quoting *Armstrong*, 432 F.3d at 700). This Court should therefore decline to consider Plaintiffs' untimely argument related to the MacDonald settlement.

In the event the Court elects to consider Plaintiffs' arguments, though, it is apparent that their positions are meritless. Plaintiffs first argue that the MacDonald settlement agreement applies to them. (*See* Plaintiffs' Brief on Appeal, pp. 14). In support of this position, Plaintiffs seem to entirely rely on the affirmative defense pled by Defendants which stated that Plaintiffs' clams may be barred by the terms of the MacDonald settlement. And while it is true that Defendants considered pursuing a defense in this matter that Plaintiffs' claims were barred by the MacDonald settlement agreement, Defendants' assertion of a potential affirmative defense is not an admission of any fact or law.

Moreover, Defendants cannot understand why Plaintiffs would argue that they are subject to the MacDonald settlement agreement. Plaintiffs blatantly misconstrue the MacDonald settlement agreement—not consent agreement—when they represent to this Court that the County and the settlement class "entered into a Consent Agreement wherein retirees [sic] medical benefits … were to be guaranteed as lifetime benefits." (Plaintiffs' Appellate Brief, p. 14). The MacDonald settlement did not guarantee medical benefits for life. Indeed, the MacDonald

settlement agreement provides that the class to which it applies are no longer entitled to receive *any* health insurance or health care benefits from Wayne County and instead receive monthly stipends from the County. (MacDonald Settlement Agreement and Release, Ex 1 to Plaintiffs' Appellate Brief, pp. 4-14). If Plaintiffs are a part of the MacDonald settlement class, they would not be eligible for any of the health care benefits they currently receive—including the health insurance about which they are complaining that they have to pay a portion of the premiums—and they would instead receive a stipend. If Plaintiffs are truly asserting that they are a part of the MacDonald settlement class and want stipends instead of health care benefits, the County would certainly be willing to consider that, but the County doubts that is what the Plaintiffs actually want.

Indeed, Plaintiffs argue that as members of the MacDonald settlement class, the benefits identified in their MOAs became vested. (Plaintiffs' Brief on Appeal, pp. 15, 17-18). In support of this assertion, Plaintiffs' point to the fact that the County enacted an ordinance addressing, in part, the MacDonald settlement and assert that their benefits were somehow transformed into retiree benefits that are somehow protected by Article IX, § 24 of the Michigan constitution. (*Id.*).[12]

---

[12] Note that on page 15 of their Brief, Plaintiffs refer to Article IX, § 2 of the Michigan constitution, but based on the context and their later reference to Article IX, § 24, it appears that there was a typographical error on page 15.

Regarding the citation to the County Ordinance § 141-44, it is unclear why Plaintiffs believe it supports their position that they are entitled to lifetime, premium-free health insurance. The subject ordinance provision simply codified the MacDonald settlement and provides certain procedures with respect to the payment of stipends. Again, if Plaintiffs were part of that settlement class, they would be entitled to stipends, not the health care benefits they currently receive as retirees under the 2008-2011 Local 3317 and POM CBAs. The ordinance provides no support for Plaintiffs' position that their alleged right to premium-free health insurance is vested for life.

Plaintiffs' citation to Article IX, § 24 of the Michigan constitution is likewise inapplicable. First, Article IX, § 24 addresses pension plans and retirement systems, neither of which apply to the MOAs. Second, Article IX, § 24 provides that the accrued financial benefits under the pension plans and retirement systems are contractual obligations and that they shall be funded during each fiscal year during which the services giving rise to those benefits are rendered. These provisions have no relationship whatsoever to Plaintiffs' claims. Plaintiffs' reliance on this provision is therefore without any legal basis, as is their entire argument regarding the MacDonald settlement agreement.

4. *Contrary to Plaintiffs' assertions, by charging Plaintiffs for a portion of their health insurance premiums, the County did not change the terms of the MOAs*.

In describing what issues of material fact Plaintiffs believe exist in this matter, they argue that the County lacks the authority under the 1990 HWBP to "change the contracts (MOAs)." (Plaintiffs' Brief on Appeal, p. 16). But the County has not argued that it has the authority to change the terms of the MOAs and the County did not change the terms of the MOAs when it began requiring the Plaintiffs to contribute to the cost of their health insurance premiums. Instead, as described previously, it is the terms of the MOAs themselves that required the change in Plaintiffs' obligation to contribute to the cost of their health insurance premiums. When the County used its authority under the 1990 HWBP to require the pre-Act 312 Award retirees to begin contributing to the cost of their health insurance premiums, Plaintiffs too were required to begin contributing since pursuant to the terms of the MOAs, they had the "same health care plan contribution liability" as those prior retirees. (*See, e.g.*, October 2008 MOA, R. 44-5, Page ID 1223).

Further, there is no question of fact with respect to the interpretation of the MOAs, the effect of their unambiguous language is to be determined as a matter of law. *See, e.g.*, *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich.

362, 367; 666 N.W.2d 251 (2003) (finding that "an unambiguous contractual provision is reflective of the parties' intent as a matter of law").  Given the unambiguous language of the MOAs, the intent of the parties can be determined as a matter of law by this Court.

> 5. *Plaintiffs allege that the "1999 Health & Welfare Benefit Plan" applied on the dates that the MOAs were signed, but no such document exists*.

In identifying the issues Plaintiffs claim have open questions of fact, it appears that Plaintiffs also assert that the District Court erred in determining that the 1990 HWBP was in effect when the MOAs were executed and not the "1999 Health & Welfare Benefit Plan."  (Plaintiffs' Brief on Appeal, p. 17).  But there is no "1999 Health & Welfare Benefit Plan."  As a consequence, Plaintiffs' argument on this point has no factual support.

> 6. *Contrary to Plaintiffs' allegations, Defendants raised affirmative defenses supporting the arguments made in the District Court that this matter should be decided on Summary Judgment*.

Plaintiffs argue that Defendants did not raise as an affirmative defense that Plaintiffs' health insurance premium obligations were tied to prior retirees. (Plaintiffs' Brief on Appeal, p. 19).

As an initial matter, Plaintiffs did not make this argument below, so for the reasons identified above, this Court should not consider it now. Regardless,

Plaintiffs are flatly wrong in their assertion. Defendants' Affirmative Defenses includes that Defendants did not breach any contractual obligations to Plaintiffs and that the terms of the MOAs bar Plaintiffs' claims. (R. 42, Page ID # 325). These affirmative defenses cover the arguments made by Defendants to the District Court as to why Plaintiffs' claims should be dismissed.

7. *The District Court did not wrongly find in Defendants' favor based on policy considerations*.

Finally, Plaintiffs assert that the District Court wrongly based its decision to grant Summary Judgment in Defendants' favor based on policy considerations (i.e., Wayne County's financial condition). (Plaintiffs' Brief on Appeal, pp. 19-21).

First, Plaintiffs' argument is irrelevant because this Court is reviewing the decision to grant Summary Judgment *de novo*. If there is a permissible legal basis for dismissing Plaintiffs' claims this Court will make that decision based on those legal considerations.

Second, even if this Court was not reviewing the grant of Summary Judgment *de novo*, Plaintiffs' assertions are false. Applying basic contract law, the District Court determined that Plaintiffs were not entitled to premium-free health insurance for life and that their premium contribution obligations were tied to the prior retirees identified in the MOAs. (Hearing transcript, June 26, 2017, pp. 16-17).

Further, the District Court specifically said that it was not getting into policy considerations in making its decision. (*Id.* at p. 17). And if anything, the District Court voiced its concern with "the policy of balancing the County budget in part by charging the retirees." (*Id.*). This would suggest, if anything, the Court's hesitancy to grant Summary Judgment in the Defendants' favor if it were to consider policy issues—which it expressly did not do.

## Conclusion

The MOAs unambiguously did not promise to provide Plaintiffs with premium-free health insurance for life. Instead, they tied Plaintiffs' contribution liability to prior retirees. Moreover, utilizing ordinary rules of contract interpretation as directed by the Supreme Court, whatever promises the County made to Plaintiffs in the MOAs expired when new CBAs replaced the CBAs under which Plaintiffs retired.

Plaintiffs have made no effort in their briefing to combat these arguments. Indeed, Plaintiffs have failed to substantively address any of the arguments made by the Defendants in the District Court and that are reasserted here. Instead, Plaintiffs make a confusing mixture of arguments based on misunderstandings of the District Court's decision, the effects of the District Court's decision on their claims, and new, meritless positions that were never raised below.

Because Plaintiffs have failed to raise any legitimate legal bases for their positions, and based on the Defendants' legal arguments made herein, Defendants respectfully request that this Court determine that Summary Judgment was properly entered in their favor.

ZAUSMER, AUGUST & CALDWELL, P.C.

*/s/ Gary K. August*
GARY K. AUGUST (P48730)
MATTHEW G. MCNAUGHTON (P66097)
32255 Northwestern Hwy., Suite 225
Farmington Hills, MI 48334
(248) 851-4111
gaugust@zacfirm.com
mmcnaughton@zacfirm.com
*Counsel for Defendants/Appellees Wayne*
Dated: May 1, 2018          *County, Robert Ficano, and Warren Evans*

## Certification of Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it is appellees' principal brief and contains less than 13,000 words, excluding the parts exempted by Fed. R. App. P. 32(f).  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Font Size 14, Times New Roman.

ZAUSMER, AUGUST & CALDWELL, P.C.

*/s/ Gary K. August*
GARY K. AUGUST (P48730)
MATTHEW G. MCNAUGHTON (P66097)
32255 Northwestern Hwy., Suite 225
Farmington Hills, MI 48334
(248) 851-4111
gaugust@zacfirm.com
mmcnaughton@zacfirm.com
*Counsel for Defendants/Appellees Wayne*
*County, Robert Ficano, and Warren Evans*

Dated: May 1, 2018

## Designation of Relevant District Court Documents

| Record of Entry No. | Description | Page ID No. |
|---|---|---|
| 1 | Plaintiffs' Complaint (February 4, 2016) | 1-11 |
| 11 | Plaintiffs' First Amended Complaint (March 23, 2016) | 74-82 |
| 18 | Plaintiffs' Second Amended Complaint (May 26, 2016) | 107-118 |
| 33 | Plaintiffs' Third Amended Complaint (October 28, 2016) | 244-255 |
| 41 | Plaintiffs' Fourth Amended Complaint (December 28, 2016) | 305-316 |
| 42 | Defendants' Answer to Plaintiffs' Fourth Amended Complaint, Affirmative Defenses, and Reliance on Jury Demand (January 9, 2017) | 317-329 |
| 44 | Defendants' Motion for Summary Judgment (January 27, 2017) | 369-404 |
| 44-1 | Local 3317 2000-2004 CBA (January 27, 2017) | 406-530 |
| 44-1 | Local 502 2000-2004 CBA (January 27, 2017) | 532-671 |
| 44-1 | 1990 Wayne County Health and Welfare Benefit Plan (January 27, 2017) | 673-687 |

| 44-2 | Patrick Melton Deposition Transcript (January 27, 2017) | 689-698 |
| 44-2 | Michael Royal Deposition Transcript (January 27, 2017) | 700-709 |
| 44-2 | Local 3317 Act 312 Award (January 27, 2017) | 711-795 |
| 44-3 | Local 502 Act 312 Award (January 27, 2017) | 797-972 |
| 44-3 | William Thompson Deposition Transcript (January 27, 2017) | 974-978 |
| 44-4 | Local 3317 2008-2011 CBA (January 27, 2017) | 980-1091 |
| 44-4 | POAM 2008-2011 CBA (January 27, 2017) | 1093-1211 |
| 44-5 | Kenneth Grabowski Deposition Transcript (January 27, 2017) | 1213-1221 |
| 44-5 | Memorandum of Agreement Dated 10/30/2008 (January 27, 2017) | 1223-1224 |
| 44-5 | Memorandum of Agreement Dated 6/22/2009 (January 27, 2017) | 1226-1227 |
| 44-5 | Memorandum of Agreement Dated 8/28/2009 (January 27, 2017) | 1229-1230 |
| 44-5 | Memorandum of Agreement Dated 9/3/2009 (January 27, 2017) | 1232 |

| 44-5 | Proposed Local 502 Agreement (January 27, 2017) | 1234-1240 |
|------|---|---|
| 44-5 | Memorandum of Agreement Dated 7/13/2009 (January 27, 2017) | 1242-1244 |
| 44-5 | Livia Calderoni Deposition Transcript (January 27, 2017) | 1246-1255 |
| 44-5 | Declaration of Livia Calderoni (January 27, 2017) | 1257-1271 |
| 44-5 | Kevin Gilliam Deposition Transcript (January 27, 2017) | 1273-1274 |
| 44-5 | Timothy Taylor Deposition Transcript (January 27, 2017) | 1276-1279 |
| 44-5 | *Serafino v. City of Hamtramck*, 2016 U.S. Dist. LEXIS 132055 (E.D. Mich. Sept. 26, 2016) (January 27, 2017) | 1281-1289 |
| 44-5 | *Bell v. Westmoreland Cent. Sch. Dist.,* 1991 U.S. Dist. LEXIS 3063 (N.D.N.Y. 1991) (January 27, 2017) | 1291-1296 |
| 59 | Order Granting Defendants' Motion for Summary Judgment (June 28, 2017) | 1640-1641 |

**<u>Proof of Service</u>**

I hereby certify that on May 1, 2018, I e-filed Defendants/Appellees Corrected Brief on Appeal, and this Certificate of Service, by using the Court's e-filing system on the counsel of record.

*/s/ Gary K. August*
Gary K. August, MI Bar No. P48730

No. 17-2246

_____

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

ANTHONY CECE; JEFFREY CHESNEY; NEIL DONAHUE;
KEVIN GILLIAM; GREGORY GORDISH; JOHN HARDIE; LESLIE
HOLCOMB; WILLIAM HOMROCKY; MICHAEL KASHOLO;
RAYMOND KERIMIAN; MICHAEL LONG; MICHAEL MEEKINS;
TAMERIA METIVA; WILLIAM MITTLESTAT; TIMOTHY MYERS;
TIMOTHY OLSZEWSKI; GARRY M. PALUCKI; TERRY POLLOCK;
CAMERON PORZONDEK; JAMES RENDALL; LUCKY RILEY;
RONALD ROBERTS; DANIEL ROULO; RONALD ROSSELLE; NINA
TRUMP; JEFFREY VAKRATSIS; REGINALD VANWULLEN;
CYTRESSE WATSON; JOSEPH WARNICK; DARLETTA BUFORD;
FRANK PENZIN; LISA CARTER; BARBARA BOLDEN; JEFFREY
FALCONER; RODNEY BRADBURN; WILLIAM THOMPSON;
JOHN KOPY; TYRONE JACKSON; REGINAIEL PRUITT, GREGORY
JOHNSON; ARLENE COLLINS; KATHLEEN DUDLEY; ANTHONY
WATSON; LINDA ROGERS; JAMES PANACKIA; EARL MOORE;
JEFFERY GAGACKI; MARY RAUBOLT; CHERYL WALKER-HEIGHT;
RAYMOND BATES; JAMES DELOOFA; JANICE MCCLELLAN;
DONALD MIXON; MICHAEL MODES; DOUGLAS L. SEIPELT,

*Plaintiffs/Appellants,*

v

WAYNE COUNTY; ROBERT FICANO; WARREN EVANS;

*Defendants/Appellees.*

_____

*On Appeal from the United States District Court for the*
*Eastern District of Michigan*
*Case No. 2:16-cv-10410 (Hon. Arthur J. Tarnow)*

_____

## DEFENDANTS/APPELLEES' ADDENDUM

{01680277}                                    59

_____

ZAUSMER, AUGUST & CALDWELL, P.C.
GARY K. AUGUST, MI Bar No. P48730
MATTHEW G. MCNAUGHTON, MI Bar No. P66097
32255 Northwestern Hwy., Suite 225
Farmington Hills, MI 48334
(248) 851-4111
gaugust@zacfirm.com
mmcnaughton@zacfirm.com
*Counsel for Defendants/Appellees Wayne County,*
*Robert Ficano, and Warren Evans*

_____

- *Goss v CitiMortgage, Inc.*, 2017 U.S. Dist. LEXIS 189604 (E.D. Mich. 2017)

Ⓐ Neutral
As of: April 19, 2018 2:45 PM Z

## *Goss v. CitiMortgage, Inc.*

United States District Court for the Eastern District of Michigan, Southern Division

November 16, 2017, Decided; November 16, 2017, Filed

Case No. 16-14391

**Reporter**

2017 U.S. Dist. LEXIS 189604 *; 2017 WL 5499400

ROBERT GOSS, JR., Plaintiff, v. CITIMORTGAGE, INC., et al., Defendants.

**Prior History:** *Goss v. Citimortgage, Inc., 2016 U.S. Dist. LEXIS 175609 ( E.D. Mich., Dec. 20, 2016)*

## Core Terms

mortgage, amended complaint, motion to dismiss, foreclosure, allegations, debt collector, promissory estoppel, quiet title, servicer, Collection, violations, default, wrongful foreclosure, breach of contract, written request, damages, escrow, dismissal with prejudice, validate, notice, pled, Reporting, consumer, modified, parties, monthly payment, foreclosed, contends, requires, designated

**Counsel:** [*1] For Robert Goss, Jr., Plaintiff: Vanessa G. Fluker, Vanessa G. Fluker, Detroit, MI.

**Judges:** ROBERT H. CLELAND, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ROBERT H. CLELAND

## Opinion

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

Plaintiff Robert Goss, Jr. brought this action for what he alleges was a wrongful foreclosure on his home. (Dkt. #1.) Plaintiff claims that Defendant CitiMortgage, Inc. and Defendant Nationstar Mortgage, LLC, the entities responsible for the mortgage on his property, failed to accept his mortgage loan payments and falsely represented the mortgage as in default. (*Id.*) Defendant CitiMortgage and Defendant Nationstar have each filed a Motion to Dismiss (Dkt. ##38, 41). Plaintiff filed separate responses. (Dkt. ##43, 44.) The court has determined that a hearing is unnecessary. E.D. Mich. LR 7.1(f)(2). Because the legal issues in these motions largely overlap, the court will address both motions in this order. For the following reasons, Defendants' motions are granted in part and denied in part.

### I. BACKGROUND

In 2005, Plaintiff entered into a mortgage agreement with ABN AMRO Mortgage Group, Inc. (Dkt. #41-2.)[1] Defendant CitiMortgage, as a successor in interest by merger to [*2] ABN AMRO, later became the holder of the mortgage. (Dkt. #35-3 Pg. ID 1069.) In 2011, Defendant CitiMortgage foreclosed on the property and sold it. (*Id.*) After the redemption period for the sale, Plaintiff filed suit against ABN AMRO and Defendant CitiMortgage challenging the foreclosure and sale. *See Goss v. ABN AMRO Mort.*

---

[1] Though the court generally refers only to Plaintiff's Amended Complaint and the documents attached to it on a motion to dismiss, the court may also consider documents that are in the public record. *Amini v. Oberlin College, 259 F.3d 493, 502 (6th Cir. 2001).* Plaintiff's initial mortgage, which is attached to Defendant CitiMortgage's Motion to Dismiss (Dkt. #41), is such a document.

Case: 17-2246   Document: 34   Filed: 05/01/2018   Page: 74

Case: 17-2246    Document: 34    Filed: 05/01/2018    Page: 75

*Grp., 549 F. App'x 466, 468 (6th Cir. 2013)*. The district court dismissed Plaintiff's complaint, and the Sixth Circuit affirmed. *Id. at 477*.

Following litigation, Plaintiff and Defendant CitiMortgage entered into a modified loan agreement (Dkt. #35-4) and Defendant CitiMortgage expunged the foreclosure in February 2015 (Dkt. #35-3). Plaintiff alleges that he has made timely payments as required by the modified loan agreement, but that Defendant CitiMortgage provided "erroneous information" regarding his escrow and a change in his mortgage payment. (Dkt. #35 Pg. ID 1039.) According to Plaintiff, Defendant Nationstar—who was servicing the loan—also began sending Plaintiff incorrect information about the payments he had been making and a balance that Defendants contended was past due. (Dkt. #35 Pg. ID 1041; Dkt. #35-16.) He further alleges that Defendant Nationstar, which was assigned the loan in November 2016 (Dkt. #41-3), wrongfully refused **[*3]** Plaintiff's payments. (Dkt. #35 Pg. ID 1039, 1041.)

Despite his timely payments, according to Plaintiff, he discovered that his payments were not being reported to major credit bureaus. (Dkt. #35 Pg. ID 1040.) When Plaintiff sent letters to Transunion and Experian disputing their reports of his payments, he received credit reports "that were contrary to his payment history and the cashed checks" he had submitted for payment. (*Id.*)

Plaintiff, in an attempt to correct the "variable payment amounts from month-to-month in direct contradiction to the required monthly payments under the modification agreement," attempted to contact Defendant CitiMortgage. (*Id.*) According to Plaintiff, "Defendant Citi[M]ortgage would send correspondence that did not address the issues raised by" Plaintiff. (*Id.*) Plaintiff eventually sent CitiMortgage a "RESPA Qualified Written Request Letter" in June 2016. (*Id.*; Dkt. #35-13.) Defendant CitiMortgage's response, however, "did not address any of the information requested in the Plaintiff's Qualified Written Request." (Dkt. #35 Pg. ID 1040-

41.) Plaintiff received his last correspondence from Defendant CitiMortgage—a letter soliciting Plaintiff for loss mitigation—in August 2016. **[*4]** (*Id.* at Pg. ID 1041.)

Plaintiff then began receiving letters from Defendant Nationstar, including a letter "indicating [Nationstar] had no record of any payments since June of 2016, when in fact, the money for the payments had been removed from Plaintiff's bank account by Defendant Citi[M]ortgage." (*Id.* at Pg. ID 1041.) In September 2016, Defendant Nationstar advised Plaintiff that he needed a loan specialist. (*Id.*)

Plaintiff, however, kept making payments. He submitted checks for his monthly mortgage payment in October, November, and December 2016, but all were returned with some communication from Defendant Nationstar. (*Id.* at Pg. ID 1041-42.) Plaintiff also received a letter and a "refund" check from Defendant Nationstar in December 2016, but says he has "no idea of what this check represented and has not cashed the check, but retained the check." (*Id.* at Pg. ID 1042; Dkt. #35-21.)

Plaintiff's home was sold at a sheriff's sale on December 20, 2016 "for an alleged default and failure to make monthly payments." (Dkt. #35 Pg. ID 1042.) One day before the sale, Plaintiff filed an "Emergency Motion for Temporary Restraining Order" (Dkt. #4) asking the court to stay the sale. The court denied the motion **[*5]** in an order entered the next day (Dkt. #5), explaining that the court lacked sufficient time to review the motion before the sale and, in any event, Plaintiff had not shown that irreparable harm would result, as Michigan law provided a variety of mechanisms by which the parties could effectively undue the foreclosure sale. (Dkt. #5 Pg. ID 201-02.) Plaintiff thereafter moved to amend his complaint to name the third party purchaser of the property—Zana Zaitouna—as a Defendant and to add a claim for a violation of the *Real Estate Settlement Procedures Act* against Defendant CitiMortgage. (Dkt. #32.)

The court granted Plaintiff's request (Dkt. #34), and Plaintiff filed an amended complaint (Dkt. #35.)

Despite the sheriff's sale, Plaintiff avers that Defendant Nationstar "has accepted Plaintiff's payments for January 2017, February 2017, March 2017, and April 2017." (Dkt. #35 Pg. ID 1042.) As a result of the negative entries on Plaintiff's credit reports, Plaintiff has been denied a business loan and a credit card; he has also had to pay higher interest on the supplies for his small business. (*Id.*)

## II. STANDARD

*Federal Rule of Civil Procedure 8(a)(2)* requires that a complaint contain "a short and plain statement of the claim showing **[\*6]** that the pleader is entitled to relief." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id. at 679*. The court views the complaint in the light most favorable to the plaintiff and accepts all well-pleaded factual allegations as true. *Tackett v. M & G Polymers, USA, LLC, 561 F.3d 478, 488 (6th Cir. 2009)*. The court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007)*.

"In determining whether to grant a *Rule 12(b)(6)* motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin College, 259 F.3d 493, 502 (6th Cir. 2001)* (quoting *Nieman v. NLO, Inc., 108 F.3d 1546, 1554*

*(6th Cir. 1997))*. Furthermore, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr. v. Ill. Union Ins. Co., 508 F.3d 327, 335-36 (6th Cir. 2007)*.

## III. DISCUSSION

Plaintiff brings seven claims, each—with the exception of Count VII—brought **[\*7]** against Defendant CitiMortgage and Defendant Nationstar[2]: (1) breach of contract; (2) promissory estoppel; (3) wrongful foreclosure under *Mich. Comp. Laws § 600.3204*; (4) violation of the *Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq.*; (5) violation of the *Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq.*; (6) quiet title; and (7) violation of *Real Estate Settlement Procedures Act, 12 U.S.C. § 2605*, as to Defendant CitiMortgage. The court will address each count in turn.

### A. Breach of Contract

Defendants argue that Plaintiff cannot state a valid claim for breach of contract because he cannot establish all the required elements under Michigan law. A claim for breach of contract under Michigan law requires the plaintiff to prove: (1) the existence of a valid contract, (2) the terms of the contract, (3) that the other party breached the contract, and (4) that the breach caused the plaintiff's injury. *Webster v. Edward D. Jones & Co., 197 F.3d 815, 816 (6th Cir. 1999)*. "The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Flamm v. Scherer, 40 Mich. App. 1, 198 N.W.2d 702, 706 (Mich. Ct. App. 1972)*.

---

[2] Though Plaintiff's Amended Complaint names individual Zana Zaitouna as a Defendant, Defendant Zaitouna was not involved in these motions. Therefore, where the court refers to "Defendants" in the remainder of this order, it is referring only to Defendants CitiMortgage and Nationstar unless otherwise noted.

Case: 17-2246     Document: 34     Filed: 05/01/2018     Page: 76

Case: 17-2246    Document: 34    Filed: 05/01/2018    Page: 77

Defendants agree that the modified mortgage agreement constitutes a valid contract. (Dkt. #38 Pg. ID 1218; Dkt. #41 Pg. ID 1285.) But both Defendants contend that Plaintiff cannot recover for [*8] breach of contract because he breached the contract first. (Dkt. #38 Pg. ID 1218-20; Dkt. #41 Pg. ID 1285-86.) Specifically, according to Defendants, the modified mortgage agreement provides that Plaintiff was responsible for paying taxes, insurance premiums, assessments, and escrow items as required under the mortgage, and they point to this provision of the modified agreement attached to Plaintiff's amended complaint. (Dkt. #35-4 Pg. ID 1072-73.) Moreover, according to the modified agreement, "[t]he escrow payments may be adjusted periodically in accordance with applicable law and therefore borrower's total monthly payment may change accordingly." (*Id.* at Pg. ID 1073.)

Defendants aver that Plaintiff was "mailed an escrow analysis disclosure statement . . . confirm[ing] that Plaintiff's monthly payment was increasing." (Dkt. #38 Pg. ID 1219.) They point to a letter attached to Plaintiff's amended complaint from Defendant CitiMortgage that documents an increased payment amount. (Dkt. #35-6.) Plaintiff, however, continued making the lower monthly payment. (Dkt. #38 Pg. ID 1219; Dkt. #41 Pg. ID 1286.) Thus, according to Defendants, Plaintiff breached the contract first, and Defendants cannot be liable [*9] for breach.

Defendant CitiMortgage presents some additional arguments for why this claim should be dismissed. According to Defendant CitiMortgage, it cannot be held liable for breach because it was permitted, under the terms of the original mortgage, to "accept insufficient payments and . . . wait to apply those payments until a sufficient payment has accumulated." (Dkt. #38 Pg. ID 1220.) Defendant CitiMortgage's acceptance of Plaintiff's partial payment, then, was not a breach. Moreover, according to Defendant CitiMortgage, Plaintiff cannot establish that it caused Plaintiff's damages because it "did not engage in foreclosure proceedings." (*Id.* at Pg. ID 1220-21.) Because Plaintiff's only alleged damage, according to the amended complaint, is that Defendants "illegally foreclos[ed] on Plaintiff's mortgage" (Dkt. #35 Pg. ID 1044), he cannot establish damages as they relate to Defendant CitiMortgage. (Dkt. #38 Pg. ID 1220.)

The court disagrees with Defendants that these arguments are sufficient on a motion to dismiss. Defendants' argument that Plaintiff was paying a lower—and therefore inadequate—amount on his mortgage is the crux of Plaintiff's claim that the higher payment sought by Defendants [*10] was improper.

Defendants would have this court rely on Defendant CitiMortgage's statement, in the letter it sent to Defendant, that Plaintiff's monthly payments were increasing pursuant to the "Escrow Analysis Disclosure Statement." (Dkt. #35-6.) Defendant Nationstar provided the court with a copy of the disclosure statement in its reply brief on the motion to dismiss. (Dkt. #47-2.) "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the] claim." *Weiner v. Klais & Co., 108 F.3d 86, 89 (6th Cir. 1997)* (quoting *Venture Assocs. Corp. v. Zenith Data Svs. Corp., 987 F.2d 429, 431 (7th Cir. 1993))*. Setting aside whether documents attached to a *reply* brief are considered part of the pleadings, the court does not find the attached escrow analysis dispositive for the motions to dismiss.

Defendants accurately quote the portion of the modified agreement providing that Plaintiff's "escrow payments may be adjusted periodically." They neglect, however, to focus the portion of this provision providing that "payments may be adjusted periodically *in accordance with applicable law*." The court will not consider, at this stage, whether the higher assessment made by Defendants, as reflected in Defendant CitiMortgage's letter to Plaintiff [*11] and the

escrow analysis, was made in accordance with applicable law. Whether Defendant CitiMortgage appropriately posted Plaintiff's "partial" payment is similarly inappropriate for consideration at this point.

Defendant CitiMortgage's argument that Plaintiff has not sufficiently pled damages against it, however, is persuasive. Plaintiff describes Defendants' "breach" in its breach of contract count as their decision to "illegally foreclos[e] on Plaintiff's mortgage, which constitutes performance that does not conform to the agreement's requirements that Defendants not foreclose so long as Plaintiff performed under the agreement." (Dkt. #35 Pg. ID 1044.) While Plaintiff alleged facts earlier in the amended complaint that would support the allegation that Defendant Nationstar's decision to foreclose was improper because payments were not correctly accepted, there is no dispute that Defendant CitiMortgage was not involved in the foreclosure proceedings at all. While Plaintiff could have pled that Defendant CitiMortgage's alleged failure to properly post Plaintiff's payment was a breach of their contract that contributed to the foreclosure, he did not do so.

Plaintiff's claim for breach of contract [*12] against Defendant CitiMortgage, therefore, is dismissed. Defendant Nationstar's motion to dismiss as to the breach of contract claim is denied.

## B. Promissory Estoppel

Defendants next argue that Plaintiff cannot state a claim for promissory estoppel because the parties had express contractual agreements. (Dkt. #38 Pg. ID 1223; Dkt. #41 Pg. ID 1287.) The doctrine of promissory estoppel permits a court to enforce an implied agreement between parties. *APJ Assocs., Inc. v. N. Am. Philips Corp., 317 F.3d 610, 617 (6th Cir. 2003)*. Promissory estoppel, however, "may not be used to override the express agreement of the parties contained in written agreements." *Id.* Promissory estoppel is therefore inapplicable where the parties are bound by an express written

agreement. *Id.*

Plaintiff does not address this distinction in his responses to the motions to dismiss, instead discussing why promissory estoppel is not subject to the statute of frauds. (Dkt. #43 Pg. ID 1338; Dkt. #44 Pg. ID 1370.) Plaintiff's own amended complaint describes the "promise" required for his promissory estoppel claim as the "*permanent loan modification agreement*." (Dkt. #35 Pg. ID 1045 (emphasis added).) Because Plaintiff's relationship with Defendants was governed by an express written contract, his [*13] claim for promissory estoppel fails. Count II of Plaintiff's amended complaint is therefore dismissed with prejudice.

## C. Wrongful Foreclosure

Defendants argue that Plaintiff's home was properly foreclosed because there was a valid default. Defendant CitiMortgage also argues that it cannot be liable for a wrongful foreclosure because it was not the entity that foreclosed on Plaintiff's property.

Michigan law permits a foreclosure by advertisement in certain circumstances. *Mich. Comp. Laws § 600.3204*. A property owner may challenge a foreclosure proceeding—rendering the foreclosure voidable—by demonstrating defects or irregularities in the proceeding. *Kim v. JPMorgan Chase Bank, N.A., 493 Mich. 98, 825 N.W.2d 329, 337 (Mich. 2012)*. "[T]o set aside the foreclosure sale, plaintiffs must show that they were prejudiced by defendant's failure to comply with *MCL 600.3204*. To demonstrate such prejudice, they must show that they would have been in a better position to preserve their interest in the property absent defendant's noncompliance with the statute." *Id.*

The court disagrees that Plaintiff has not stated a claim for wrongful foreclosure as to Defendant Nationstar. Plaintiff has alleged facts demonstrating a defect in the foreclosure proceeding—namely, that Plaintiff was not in default and "had made all the required [*14] payments timely, and in

Case: 17-2246     Document: 34     Filed: 05/01/2018     Page: 78

accordance with the modification agreement." (Dkt. #35 Pg. ID 1046.) Because *Mich. Comp. Laws § 600.3204(1)(a)* permits a foreclosure by advertisement only where "[a] default in a condition of the mortgage has occurred, by which the power to sell became operative," a lack of default by Plaintiff would render the foreclosure sale improper. *See Starr v. Fannie Mae, No. 14-14380, 2015 U.S. Dist. LEXIS 29629, 2015 WL 1120129, at *2-3 (E.D. Mich. Mar. 11, 2015)* (O'Meara, J.); *see also Jpmorgan Chase Bank v. Zair, No. 329761, 2017 Mich. App. LEXIS 41, 2017 WL 128238, at *4 (Mich. Ct. App. Jan. 12, 2017)*. Moreover, according to Plaintiff, had his payments been properly applied, "there would have been no erroneous default and illegal foreclosure." (Dkt. #35 Pg. ID 1046.) Plaintiff has therefore sufficiently alleged prejudice under *Kim*, as he would have been in a better position to preserve his property interest absent Defendants' failure to properly apply his payments. Defendant Nationstar's claim that Plaintiff did not properly pay the higher amount required under his mortgage is, as noted above, not appropriate for review at this stage.

Again, however, there appears no dispute that Defendant CitiMortgage, which transferred the mortgage to Defendant Nationstar prior to foreclosure, was not involved in the foreclosure proceedings. Defendant CitiMortgage, therefore, cannot have violated *Mich. Comp. Laws 600.3204*. *See Kemp v. Resurgent Capital Servs., No. 13-11794, 2013 U.S. Dist. LEXIS 150713, 2013 WL 5707797, at *3 (E.D. Mich. Oct. 21, 2013)* (Cohn, J.) (holding that plaintiff could [*15] not allege that defendant Quicken Loans, the originator of her mortgages before a subsequent transfer, "lacked standing" to initiate foreclosure "for the simple reason that Quicken Loans ha[d] no interest [in] either loan and ha[d] no role in the foreclosure proceedings"). Plaintiff's claim for wrongful foreclosure, therefore, is dismissed with prejudice as to Defendant CitiMortgage.

## D. Violation of the Fair Debt Collection Practices Act

Plaintiff alleges that Defendants have violated various provisions of the Fair Debt Collection Practices Act ("FDCPA"). Specifically, Plaintiff claims that Defendants violated the FDCPA by (a) "Failing to properly and completely validate the debt of Counter Plaintiffs [sic] despite numerous oral request [sic] and a written request being made"; (b) "Initiating collection action on an erroneous debt, before validation, despite numerous requests being made by Plaintiff"; and (c) "Using false representations as to the amount of the debts as a means to collect or attempt to collect the debt." (Dkt. #35 Pg. ID 1047.) Plaintiff also alleges that "Defendants violated *Section 1692* of the Fair Debt Collection Practices Act by attempting to collect an amount for the debt which is not [*16] expressly authorized by the agreement creating the debt or permitted by law." (*Id.*)

Defendant CitiMortgage contends that it cannot be liable for an FDCPA claim for the simple reason that it is not a debt collector. (Dkt. #38 Pg. ID 1225.) The FDCPA, which regulates certain conduct by debt collectors, defines "debt collector" as a person who collects debts owed or due to another. *15 U.S.C. § 1692a(6)*. As Defendant CitiMortgage points out, however, where a party—like a bank—is "an actual, original, consumer creditor" collecting on its own account, that party is "exempted from the statutory definition of a 'debt collector.'" *Montgomery v. Huntington Bank, 346 F.3d 693, 699 (6th Cir. 2003)*. Plaintiff does not respond to this case law or the argument that Defendant CitiMortgage, as the originator of Plaintiff's loan, is not a debt collector, instead asserting in conclusory fashion that "Defendant Citi[M]ortgage is a debt collector under the Act," without citation. (Dkt. #43 Pg. ID 1345.) Because Defendant CitiMortgage is not a debt collector for the purposes of the FDCPA, Plaintiff's claim for FDCPA violations against Defendant CitiMortgage is dismissed with prejudice.

Case: 17-2246    Document: 34    Filed: 05/01/2018    Page: 79

Case: 17-2246    Document: 34    Filed: 05/01/2018    Page: 80

Defendant Nationstar, as the former servicer of Plaintiff's mortgage, argues that Plaintiff's claim against it for FDCPA **[*17]** violations must be dismissed (1) because to invoke the protections of the FDCPA for a disputed debt, a consumer must notify the debt collector in writing of the dispute, which Plaintiff did not do (Dkt. #41 Pg. ID 1291); (2) because Defendant Nationstar did not have a duty to verify the validity of the debt Plaintiff owed, and therefore Plaintiff cannot set forth a plausible claim that Defendant Nationstar "falsely represent[ed] the amount of the debt" (*Id.* at Pg. ID 1292); and (3) because this count of Plaintiff's amended complaint "contains insufficient facts on which to put Nationstar on notice of the allegations raised" (*Id.*).

Plaintiff specifies for the first time in response to the motion to dismiss that he is claiming violations of *15 U.S.C. § 1692e(2)*, *1692e(8)*, and *1692e(10)*. (Dkt. #44 Pg. ID 1374.) The court, however, will consider only those allegations Plaintiff set forth in the amended complaint, as outlined above.

Plaintiff's first and second allegations of FDCPA violations—that Defendants failed "to properly and completely validate the debt of Counter Plaintiffs [sic] despite numerous oral request [sic] and a written request being made" and that Defendants initiated "collection action on an erroneous debt, before validation, **[*18]** despite numerous requests being made by Plaintiff"—fail as pled. Though the court is not sure to which FDCPA provisions these claims relate, Plaintiff's allegations most clearly invoke *§ 1692g*, which concerns the validation of debts. A debt collector is required under the act to cease collection on a debt where "the consumer notifies the debt collector in writing" within 30 days after the receipt of a notice of debt; a debt collector may resume collection only after validating the debt and sending a verification of the debt to the consumer. *§ 1692g(b)*. Here, Plaintiff has not sufficiently alleged that he notified Defendant Nationstar, in writing, that he disputed the debt. Plaintiff's "numerous oral request [sic]," as alleged, would not activate the requirements of *§*

*1692g(b)*. Moreover, though Plaintiff references one "written request being made," the amended complaint cites "Exhibits [sic] 12," attached to the amended complaint, for this proposition; this exhibit (Dkt. #35-13), is a letter styled as a "Qualified Written Request Under RESPA" sent to Defendant CitiMortgage—not Defendant Nationstar.

It is true that *§ 1692g(a)* requires that debt collectors provide consumers with certain information concerning the debt it **[*19]** is trying to collect. But Plaintiff has not alleged that Defendant Nationstar failed to provide this required information. Rather, Plaintiff's amended complaint limits itself to the allegation that Defendant Nationstar did not validate the debt despite requests to do so. Because this requirement is triggered only by a written notice of dispute pursuant to *§ 1692g(b)*, Plaintiff has not adequately alleged that Defendant Nationstar improperly refused to validate the debt.

The court disagrees with Defendant Nationstar, however, that Plaintiff's claim for "[u]sing false representations as to the amount of the debts as a means to collect or attempt to collect the debt" should be dismissed. Though not cited, Plaintiff seems to refer to *§ 1692e*, which prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt." Plaintiff's amended complaint alleges that "Plaintiff began receiving letters from Defendant Nationstar Mortgage indicating they had no record of any payments since June of 2016, when in fact, the money for the payments had been removed from Plaintiff's bank account by Defendant Citimortgage." (Dkt. #35 Pg. ID 1041.) Plaintiff **[*20]** cites a letter from Defendant Nationstar, attached as an exhibit to the amended complaint, dated September 2, 2016 (when Defendant Nationstar was still the servicer of Plaintiff's mortgage). (Dkt. #35-16.) The letter indicates that Plaintiff's loan is "past due in the amount of $5,199.63." (*Id.*) As noted above, the court will not now consider whether or not this

Case: 17-2246     Document: 34     Filed: 05/01/2018     Page: 81

statement was false or misleading, as to do so would be inappropriate on a motion to dismiss. Plaintiff's allegation, therefore—that this statement was false and an attempt to collect a debt—is sufficiently pled.

Plaintiff's remaining FDCPA claim—that Defendants attempted "to collect an amount for the debt which is not expressly authorized by the agreement creating the debt or permitted by law"—fails as insufficiently pled. The court agrees with Defendant Nationstar that this claim does not "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. The court cannot tell, from the face of Plaintiff's amended complaint, which section of the FDCPA Plaintiff might be referencing. To the extent, then, that Plaintiff means to set out a separate violation of the FDCPA **[\*21]** by this language, the court will dismiss it.

### E. Violation of the Fair Credit Reporting Act

Defendants argue that Plaintiff's claim for violation of the *Fair Credit Reporting Act ("FCRA")* must be dismissed because the provision of the FCRA he cites in the amended complaint—*15 U.S.C. § 1681s-2(a)*—does not provide a private right of action. (Dkt. #38 Pg. ID 1226; Dkt. #41 Pg. ID 1293.) The Sixth Circuit has held that the FCRA provides a private right of action for violations of *§ 1681s-2(b)*—not *§ 1681s-2(a)*. *Boggio v. USAA Fed. Sav. Bank, 696 F.3d 611, 615 (6th Cir. 2012)*; *see also Farris v. Morgan Stanley Dean Witter Credit Corp., No. 08-11851, 2010 U.S. Dist. LEXIS 76775, 2010 WL 3023808, at \*4 (E.D. Mich. July 29, 2010)* (Rosen, J.) ("There is no private cause of action for consumers against furnishers of information for failure to comply with *§ 1681s—2(a)*.").

Plaintiff has not responded to this precedent, and instead block quotes—for three pages—the statutory language of *§ 1681s-2*. (Dkt. #43 Pg. ID 1346-48; Dkt. #44 Pg. ID 1377-80). If Plaintiff meant to plead a violation of *§ 1681s-2(b)*, he has not done so. His averment in the amended complaint that "[t]he above-described conduct violated the Fair Credit Reporting Act, including but not limited to, *15 USC §1681s-2(a)*," (Dkt. #35 Pg. ID 1049), is insufficient to state a violation of *§ 1681s-2(b)*. Plaintiff's claim for violation of *§ 1681s-2(a) of the FCRA*, therefore, is dismissed with prejudice.

### F. Quiet Title

Defendants argue that Plaintiff has not established a prima **[\*22]** facie claim for quiet title because—as he was the one who defaulted on the mortgage—he has not alleged that he has superior interest in the title to his property. (Dkt. #38 Pg. ID 1227; Dkt. #41 Pg. ID 1294.) Defendant CitiMortgage further contends that Plaintiff's quiet title claim should be dismissed as it relates to Defendant CitiMortgage because it "no longer claims an interest in the Property." (Dkt. #38 Pg. ID 1229.)

Quiet title in Michigan is governed by *Mich. Comp. Law § 600.2932(1)*, which "codified actions to quiet title and authorized suits to determine competing parties' respective interests in land." *Republic Bank v. Modular One, LLC, 232 Mich. App. 444, 591 N.W.2d 335, 337 (Mich. Ct. App. 1998)*, *overruled on other grounds by Stokes v. Millen Roofing Co., 466 Mich. 660, 649 N.W.2d 371 (Mich. 2002)*. "In an action to quiet title, the plaintiffs have the burden of proof and must make out a prima facie case of title." *Beulah Hoagland Appleton Qualified Pers. Residence Tr. v. Emmet Cty. Road Comm'n, 236 Mich. App. 546, 600 N.W.2d 698, 700 (Mich. Ct. App. 1999)*. "If the plaintiffs make out a prima facie case, the defendants then have the burden of proving superior right or title in themselves." *Id.*

The court agrees that Plaintiff cannot sustain a

Case: 17-2246 Document: 34 Filed: 05/01/2018 Page: 82

claim for quiet title against Defendant CitiMortgage, which does not claim an interest in the property. However, Defendant Nationstar's argument that Plaintiff cannot sustain a claim of quiet title because of his default fails for the same reasons as the other default-related [*23] claims described above: this stage is inappropriate for a determination of whether there was a valid default. Plaintiff claims that his property was wrongly foreclosed on because of actions by Defendants—namely, that they did not properly apply his mortgage payments to his account. Plaintiff, therefore, has alleged that he has a superior claim to the property sufficient to survive a motion to dismiss as to Defendant Nationstar.

## G. Violation of the Real Estate Settlement Procedures Act as to Defendant CitiMortgage

Finally, Defendant CitiMortgage contends that it cannot be liable for Plaintiff's claim that it violated RESPA by "fail[ing] to respond to Plaintiff's inquiry and make the necessary corrections to [his] mortgage, in violation of *12. U.S.C. [§] 2605(e)*." (Dkt. #35 Pg. ID 1052.) Defendant CitiMortgage contends that this claim must be dismissed because (1) it did respond to Plaintiff's request (Dkt. #38 Pg. ID 1230); (2) its response was "adequate under the statute" (*Id.* at Pg. ID 1230-31); (3) Plaintiff has not adequately pled that the RESPA violation caused his damages (*Id.* at Pg. ID 1232); (4) its response was not required under RESPA because Plaintiff's letter amounted to a "duplicative notice of error" [*24] (*Id.* at Pg. ID 1232); and (5) Plaintiff sent his request to the incorrect address (*Id.* at Pg. ID 1233-35). Plaintiff focuses his response on two of these arguments, contending that Defendant CitiMortgage's receipt of the request obviates any requirement to send it to a particular address and that he has adequately pled that Defendant CitiMortgage's RESPA violation caused his damages.

There appears no dispute that Defendant CitiMortgage did respond, in some fashion, to

Plaintiff's RESPA request. The court has reviewed the response Defendant CitiMortgage claims it sent to Plaintiff, attached to Defendant CitiMortgage's motion (Dkt. #38-2), which the court may properly consider because it was referred to in Plaintiff's amended complaint (Dkt. #35 Pg. ID 1040-41). *See Weiner v. Klais & Co., 108 F.3d 86, 89 (6th Cir. 1997).* Though Plaintiff does not specifically respond, in his briefing, to the argument that Defendant CitiMortgage's letter sufficiently addresses his RESPA request, the court cannot determine at this stage that the response is adequate. Although the letter purports to include an "Escrow Analysis Disclosure Statement (EADS) from April 19, 2016" (Dkt. #38-2 Pg. ID 1013), none is included as part of the exhibit. The court will [*25] not determine at this stage, therefore, that Defendant CitiMortgage is entitled to dismissal of the RESPA claim on the basis that it adequately responded.

The court will similarly not dismiss the RESPA claim on the basis that Plaintiff's qualified written response amounted to a duplicative notice of error to which Defendant CitiMortgage was not required to respond. According to Defendant CitiMortgage's brief, "*12 U.S.C. § 2605(g)(1)(i)* states that a servicer is not required to respond if '[t]he asserted notice of error is substantially the same as an error previously asserted by the borrower for which the servicer has previously complied with its obligation to respond. . . .'" (Dkt. #38 Pg. ID 1232.) This provision of the U.S. Code—*12 U.S.C. § 2605(g)(1)(i)*—does not exist. Defendant CitiMortgage, apparently, intends to rely on *12 C.F.R. § 1024.36(f)(1)(i)*, which provides that a servicer is not required to respond to a qualified written request if "[t]he information requested is substantially the same as information previously requested by the borrower for which the servicer has previously complied with its obligation to respond."

Defendant CitiMortgage cites an April 12, 2016 letter it sent to Plaintiff (evidently in response to a letter sent by Plaintiff in late March 2016) [*26]

that Plaintiff attached to his amended complaint. (Dkt. #35-6.) Defendant CitiMortgage contends that this letter adequately responded to Plaintiff's March 2016 letter, and that, therefore, Plaintiff's June 2016 letter to Defendant CitiMortgage was duplicative and did not require a response. Because this letter similarly does not include an escrow analysis (though it cites the one that Defendant CitiMortgage claims it "mailed to [Plaintiff] on July 20, 2015" (Dkt. #35-6 Pg. ID 1113)), the court cannot conclude at this stage that Defendant CitiMortgage was not required to respond to Plaintiff's June 2016 qualified written request. To do so would require the court to find that this initial (April 2016) response was adequate or provided Plaintiff with "substantially the same" information he requested in the June 2016 letter. Based on the information presently before the court, it cannot make such a finding.

As to Defendant CitiMortgage's argument that Plaintiff has not adequately alleged that the RESPA violation caused his damages, Plaintiff responds that a RESPA violation does not require RESPA damages to be pled artfully. (Dkt. #43 Pg. ID 1353.) Plaintiff cites *Marais v. Chase Home Fin. LLC, 736 F.3d 711, 720 (6th Cir. 2013)*. In *Marais*, defendant **[*27]** Chase Home Finance, a servicer of the plaintiff's loan, argued that the plaintiff's RESPA violation claim should be dismissed because the plaintiff had failed to allege a sufficient causal link between the plaintiff's alleged damages and Chase's insufficient response to her qualified written request under RESPA. The Sixth Circuit noted that two prior Sixth Circuit cases "counsel[] against dismissal of RESPA claims on the basis of inartfully-pleaded actual damages." *Id. at 722*. The Sixth Circuit determined that the plaintiff had sufficiently alleged causation by pleading that her higher interest rates and Chase's provision of incorrect information to consumer reporting agencies were caused by Chase's insufficient response to her request. *Id. at 721*.

Here, Plaintiff has alleged that Defendant CitiMortgage's failure to adequately respond to his letter caused his foreclosure, caused him to incur a higher interest rate on the equipment he purchases for his business, and caused him to be denied a business loan. (Dkt. #35 Pg. ID 1053.) In light of the Sixth Circuit's guidance in *Marais*, the court finds that these allegations of damages are sufficient to withstand a motion to dismiss.

Finally, the court rejects **[*28]** Defendant CitiMortgage's argument that it cannot be liable under RESPA because Plaintiff did not send his notice of error to the correct address. Defendant CitiMortgage raised this same argument in its opposition to Plaintiff's motion to amend his complaint. (Dkt. #33 Pg. ID 992.) The court "set[] aside" the issue of "whether a failure to use an established address would be fatal to Plaintiff's statutory claim" because it was not obvious whether Defendant CitiMortgage "had established a QWR mailing address." (Dkt. #34 Pg. ID 1034.) The court noted that the regulation permitting a servicer to established a designated address—*12 C.F.R. § 1024.36(c)*—also requires the servicer to "post the designated address on any Web site maintained by the servicer if the Web site lists any contact address for the servicer," an issue Defendant CitiMortgage had omitted from its briefing. (Dkt. #34 Pg. ID 1034.) The court noted that it would need "some evidence" that Defendant CitiMortgage's purported designated address in Hagerstown, MD "appeared on the website at the time Plaintiff sent his inquiry." (*Id.*)

Defendant CitiMortgage has apparently attempted to provide this evidence by noting in its motion to dismiss that "[c]urrently, [its] **[*29]** website states, '"To submit a written Notice of Error, Request for Information or Qualified Written Request, it must be sent to the following designated address: CitiMortgage, Inc. P.O. Box 6728 Sioux Falls, SD 57117-6728.[']" (Dkt. #38 Pg. ID 1234.) The problem here, however, is that this does not cure the deficiency noted by the court—that it would need evidence of the designated address on the website "*at the time Plaintiff sent his inquiry*." Defendant CitiMortgage's averment that its website

Case: 17-2246     Document: 34     Filed: 05/01/2018     Page: 83

2017 U.S. Dist. LEXIS 189604, *29

## IV. CONCLUSION

Defendant Nationstar has not demonstrated that it is
entitled to dismissal of certain of Plaintiff's claims
based on the argument that he defaulted on his
mortgage—namely Plaintiff's claims for breach of
contract, wrongful foreclosure, and quiet title.
Defendant CitiMortgage is, however, entitled to
dismissal on those claims that allege wrongful
activity in the foreclosure itself, namely Plaintiff's
claims for breach of contract, wrongful foreclosure,
and quiet title. Plaintiff's claims for promissory
estoppel and violation of the *FCRA § 1681s—2(a)*
are legally insufficient and are dismissed with
prejudice. Plaintiff's **[*30]** claim for violations of
the FDCPA are dismissed with prejudice as to
Defendant CitiMortgage and dismissed in part as to
Defendant Nationstar. Plaintiff's claim against
CitiMortgage for violation of RESPA is sufficiently
alleged at this stage. Accordingly,

IT IS ORDERED that Defendants' Motions to
Dismiss (Dkt. ##38, 41) are GRANTED IN PART
and DENIED IN PART.

Specifically, as to Defendant CitiMortgage, IT IS
GRANTED in that Count I (Breach of Contract) is
DISMISSED and the following claims are
DISMISSED WITH PREJUDICE: Count II
(Promissory Estoppel); Count III (Wrongful
Foreclosure); Count IV (Violations of the Fair Debt
Collection Practices Act); Count V (violations of
the Fair Credit Reporting Act *§ 1681s—2(a)*); and
Count VI (Quiet Title). Defendant CitiMortgage's
motion to dismiss Count VII (violation of the Real
Estate Settlement Procedures Act) is DENIED.

As to Defendant Nationstar, IT IS GRANTED in
that the following claims are DISMISSED WITH
PREJUDICE: Count II (Promissory Estoppel) and
Count V (Violations of the Fair Credit Reporting
Act *§ 1681s—2(a)*). Defendant Nationstar's motion
to dismiss Count I (Breach of Contract), Count III

(Wrongful Foreclosure), and Count VI (Quiet Title)
is DENIED. **[*31]** Defendant Nationstar's motion
to dismiss Count IV (Violations of the Fair Debt
Collection Practices Act) is DENIED with respect
to *§ 1692e*; all other claimed violations of the
FDCPA are DISMISSED.

/s/ Robert H. Cleland

ROBERT H. CLELAND

UNITED STATES DISTRICT JUDGE

Dated: November 16, 2017